UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
HK KOLMAR USA, LLC,                                      :

                    Plaintiff,                             :          OPINION AND ORDER

      -v.-                                              :          24 Civ. 9144 (GWG)

WORMSER CORPORATION,                            :

                  Defendant.                             :

------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      In this consolidated action, Wormser Corporation ("Wormser") brings suit against HK

Kolmar USA, LLC ("Kolmar"), formerly known as Process Technologies and Packaging LLC,

for breaching a "Supply Agreement" and purchase orders placed pursuant to the Supply

Agreement.  See Complaint, filed Jan. 14, 2025 (Docket # 1 in No. 25-cv-00377) ("Wormser

Compl.").  Kolmar brings suit against Wormser for breach of contract based on the Supply

Agreement and purchase orders, for breach of two separate contracts — a "Powder Foundation

Agreement" and a "Storage Agreement" — and for common-law indemnification.  See Amended

Complaint, filed May 21, 2025 (Docket # 41) ("Kolmar Compl.").  Both parties have moved to

dismiss under Fed. R. Civ. P. 12(b)(6).[1]

---

[1] See Kolmar's Notice of Motion to Dismiss, filed Apr. 30, 2025 (Docket # 27); Kolmar's
Memorandum of Law in Support of Motion to Dismiss, filed Apr. 30, 2025 (Docket # 28)
("Kolmar Mem."); Declaration of Jennifer M. Rosa in Support of Motion to Dismiss, filed Apr.
30, 2025 (Docket # 29) ("Rosa Decl."); Wormser's Memorandum of Law in Opposition to
Motion to Dismiss, filed June 6, 2025 (Docket # 45) ("Wormser Opp."); Kolmar's Reply
Memorandum of Law in Support of Motion to Dismiss, filed June 20, 2025 (Docket # 48)
("Kolmar Reply"); Wormser's Notice of Motion to Dismiss, filed July 11, 2025 (Docket # 51);
Wormser's Memorandum of Law in Support of Motion to Dismiss, filed July 11, 2025 (Docket
# 52) ("Wormser Mem."); Declaration of Evan Wormser in Support of Motion to Dismiss, filed
July 11, 2025 (Docket # 53); Kolmar's Opposition to Motion to Dismiss, filed July 29, 2025

For the following reasons, the motions are granted in part and denied in part.

I.   BACKGROUND

A.   Factual Allegations

For purposes of the Rule 12(b)(6) motions, the allegations in each complaint are accepted as true.  See Manhattan Cmty. Access Corp. v. Halleck, 587 U.S. 802, 806 (2019).  Also, "[w]here . . . certain contracts are integral to the complaint[s], we also consider those documents in deciding the merits of the motion[s]."  Interpharm, Inc. v. Wells Fargo Bank, N.A., 655 F.3d 136, 141 (2d Cir. 2011).

1.   Wormser's Allegations

Wormser produces "packaging and components" (such as bottles and containers) for cosmetics companies including L'Oréal.  Wormser Compl. ¶ 38.  Kolmar produces the cosmetics "to be filled into the packaging and components" supplied by Wormser.  Id. ¶ 39; see id. ¶ 31.  In 2016, Wormser and Kolmar executed a "Supply Agreement" in which they promised to "act with complete and mutual exclusivity in purchasing Product" for IT Cosmetics, a division of L'Oréal. Id. ¶ 40; see id. ¶ 3; Supply Agreement, annexed as Ex. 1 to Rosa Decl. (Docket # 29-1), ¶ 10.1. Kolmar pledged in § 2.2 of the Supply Agreement to "sell to . . . Wormser the total requirements for Services needed by Wormser for its day-to-day manufacturing and distributing activities" for the duration of the contract.  Id. ¶ 82.

In 2018, L'Oréal contracted with Wormser to purchase "bottled units" of a beauty product called "Confidence in a Foundation" ("CIAF").  Id. ¶ 54; see id. ¶ 1.  Wormser "subcontracted"

---

(Docket # 58) ("Kolmar Opp."); Declaration of Jennifer M. Rosa in Opposition to Motion to Dismiss, filed July 29, 2025 (Docket # 59) ("2d Rosa Decl."); Wormser's Reply Memorandum of Law in Support of Motion to Dismiss, filed Aug. 15, 2025 (Docket # 64) ("Wormser Reply"); Letter from Jennifer M. Rosa, dated Sept. 2, 2025 (Docket # 68) ("Kolmar Sur-Reply"); Letter from Russell Bogart, dated Sept. 9, 2025 (Docket # 69) ("Wormser Resp.").

with Kolmar to "develop and manufacture" CIAF, id. ¶ 55, for filling in "bottles . . . and other components" supplied by Wormser, id. ¶ 56. Beginning in November 2018, Wormser sent purchase orders for CIAF to Kolmar. See id. ¶ 61. "The first page of each Purchase Order . . . supplied terms specific to each order such as a description of the item [i.e., CIAF] being purchased." Id. ¶ 64. "The second page . . . contained Wormser's Standard Purchase Order Terms and Conditions," or "TACs." Id. ¶ 65. An exemplar of the second page of a purchase order appears as an exhibit to the Wormser complaint. Standard Purchase Order Terms and Conditions, annexed as Ex. A to Wormser Compl. (Docket # 1-1 in No. 25-cv-00377).

> Paragraph 1 of the purchase orders' TACs states:
>
> This order is Buyer's [i.e., Wormser's] offer to Seller [i.e., Kolmar] & is not an acceptance by Buyer of any offer to sell by Seller or of any terms & conditions contained in any such offer. Acceptance of this order & its terms should be executed within 3 business days of issuance or its acceptance, in its entirety, will be assumed. Any request for deviation of Wormser's standard terms must be made in writing.

Wormser Compl. ¶ 66.

> Paragraph 8 states, "Seller shall maintain all necessary insurance coverages, including public liability and Workman's Compensation insurance. Seller shall indemnify and save harmless and defend Buyer from any & all claims or liabilities arising out of work covered by this paragraph." Id. ¶ 69.

> Paragraph 10 states:
>
> Seller, at its expense, shall indemnify Buyer & save Buyer harmless from any & all liability, demands, causes of action or claims, whether well founded or otherwise, including the cost of defending the same, for bodily injury to any person or damage to property, either real or personal, of any person whomsoever in any way arising out of, in the course of, or in connection with the goods &/or services purchased hereunder or the operations of the Seller in carrying out the provisions & terms of this agreement.

Id. ¶ 70.

Between November 2018 and April 2019, Wormser sent 89 purchase orders for CIAF to Kolmar.  Id. ¶ 61.  Between December 2018 and May 2019, Wormser paid Kolmar — and Kolmar accepted — almost $4.9 million for CIAF.  Id. ¶ 60; see id. ¶ 73.

L'Oréal had concerns about the quality of CIAF almost from the start.  See id. ¶ 88.  These concerns grew after L'Oréal received "negative comments from customers and social media influencers" about CIAF, including complaints of "sandiness," "sliminess," and "grittiness" following CIAF's launch in March 2019.  Id. ¶¶ 90-91.  From November 2018 to April 2019, Kolmar attempted various remedial measures, see id. ¶¶ 88-89, 100-05, but these apparently failed to satisfy L'Oréal, which "notified Wormser that it was suspending all shipments of CIAF" on April 8, 2019, id. ¶ 94.  L'Oréal then terminated its CIAF contract with Wormser on May 10, 2019.  Id. ¶ 111.  Later, L'Oréal sued Wormser (for breach of contract and breach of warranty) and Kolmar (for breach of warranty, fraudulent misrepresentation, and negligent representation).  See id. ¶¶ 10, 122-27.  Kolmar did not indemnify Wormser for the cost of defending or settling L'Oréal's lawsuit, and Kolmar had no insurance covering these costs.  See id. ¶ 132-33, 136.

Wormser now alleges that Kolmar's failure to indemnify it or obtain insurance breached paragraphs 8 and 10 of the purchase orders' TACs.  See id. ¶ 129-36.  Wormser also alleges that Kolmar breached § 2.2 of the Supply Agreement on the ground that L'Oréal's termination of its CIAF contract meant that Kolmar was unable to "sell to . . . Wormser the total requirements for Services needed by Wormser for its day-to-day manufacturing and distributing activities."  See id. ¶ 138-45.  Wormser claims unspecified monetary damages for these breaches.  See id. ¶¶ 136, 145.

2.  Kolmar's Allegations

Kolmar's claims may be divided into four categories: (1) claims for breach of contract, promissory estoppel, and quantum meruit relating to purchase orders for CIAF (Counts I, II, and III); (2) a claim for common law indemnity arising from L'Oréal's lawsuit (Count IV); (3) claims for breach of contract, promissory estoppel and quantum meruit relating to a "Powder Foundation Agreement" (Counts V, VI, and VII); and (4) a claim for breach of contract relating to a "Storage Agreement" (Count VIII).

As to the first category, Kolmar also alleges the existence of the Supply Agreement and states that, in accordance with the parties' obligations under this contract, Wormser would issue purchase orders to Kolmar "through the use of a shared spreadsheet."  Kolmar Compl. ¶ 38; see id. ¶ 3.  In turn, Kolmar would submit invoices "at the time of shipment[] that demanded payment from Wormser."  Id. ¶ 39.  Kolmar notes that the Supply Agreement contains dispute-resolution procedures related to product defects.  See id. ¶¶ 73, 78.  Kolmar also cites to portions of the TACs appearing on the reverse of each purchase order, which state that Wormser could cancel purchase orders "without liability" within one week of issuance or if Kolmar could not "meet contract commitments related to time, price, quality & quantity" or "produce goods in [a] previously approved factory."  Id. ¶ 40.  Otherwise, Wormser could cancel purchase orders only "with liability."  Id. ¶ 41.

In May 2018, "L'Oréal entered into an arrangement whereby Wormser and [Kolmar] would manufacture" CIAF.  Id. ¶ 46.  "In connection with the arrangement, Wormser — and not [Kolmar] — entered into a separate supply agreement with L'Oréal."  Id.  "Wormser managed virtually every aspect of the CIAF project" and was "responsible for" inspecting CIAF and liaising with L'Oréal.  Id. ¶ 47.  Wormser began sending purchase orders to Kolmar for CIAF in

5

November 2018 "and continued to issue them through March 2019." Id. ¶ 50. In reliance on these purchase orders, Kolmar "purchased raw materials, manufactured bulk product, and completed the production of pallets of finished goods of CIAF." Id. ¶ 68; see ¶ 69. "Wormser also directed [Kolmar] to purchase additional raw material as 'safety stock' for the manufacture of CIAF" in December 2018, which Kolmar did. Id. ¶ 49; see ¶ 70.

Wormser's management of the CIAF project devolved into "mismanagement." Id. ¶ 51. Wormser led the parties' "efforts to address L'Oréal's concerns" over the quality of CIAF "but failed." Id. ¶ 54. "As a result, the CIAF project, and L'Oréal's relationship with Wormser, collapsed." Id. ¶ 59. On April 8, 2019, L'Oréal "put all CIAF on hold." Id. ¶ 57. The same day, Wormser cancelled a slate of purchase orders. Id. ¶ 58. On May 10, 2019, L'Oréal terminated its CIAF contract. Id. ¶ 60. Ultimately, Wormser fully or partially cancelled purchase orders dating "from November 14, 2018 to March 21, 2019." Id. ¶ 67. "From [Kolmar's] first delivery of CIAF to the date that L'Oréal discontinued CIAF," Wormser never provided notice of any defects pursuant to the Supply Agreement's dispute-resolution procedures or of non-compliance with the terms of any purchase order. Id. ¶ 73.

Kolmar "still has on hand raw materials, bulk product, and . . . finished CIAF goods . . . worth more than $1.6 million," which it "has no use for and cannot resell," id. ¶ 74, and which Wormser has not paid for, id. ¶ 76. Kolmar communicated this "liability" in a May 21, 2019, email to Wormser. Id. ¶ 118. Additionally, Wormser had supplied Kolmar with "component parts" for CIAF, which Kolmar continues to store, id. ¶ 75, even though Wormser has not paid the $62,100 cost of storage, id. ¶¶ 75-76. By refusing to pay, Wormser has allegedly breached the terms of the relevant purchase orders, id. ¶ 120, or "an agreement between the parties formed

by the parties' conduct and course of dealings," id. ¶ 122.  Wormser is alleged to be liable in the alternative on theories of promissory estoppel or quantum meruit.  See id. ¶¶ 125, 135.

As to the second category, Kolmar, along with Wormser, was sued by L'Oréal in relation to the CIAF contract.  Id. ¶ 63.  Both Kolmar and Wormser settled with L'Oréal.  Id. ¶ 64. Kolmar "suffered substantial injury because it was forced to settle the L'Oréal action, despite having engaged in no wrongdoing."  Id. ¶ 143.  Kolmar alleges that "[p]rinciples of equity and good conscience dictate that [Kolmar's] settlement payment ought to have been paid by Wormser as the sole wrongdoer."  Id. ¶ 145.  Kolmar seeks common-law indemnification from Wormser. Id.

As to the third category, Kolmar and Wormser were "engaged" on an unspecified date "to manufacture a Powder Foundation" for an entity Kolmar refers to as the "Client."  Id. ¶ 81.  In September 2019, "the Client announced a policy change regarding the Powder Foundation," id. ¶ 83, and as a result, "some of the bulk product that [Kolmar] had produced for the Client was rendered unusable," id. ¶ 84.  "By early 2019," Kolmar and Wormser "reached an agreement" — the Powder Foundation Agreement — "that the companies would share the losses resulting from the Client's change of policy, in equal thirds," id. ¶ 86, "with Wormser being responsible both for its portion and securing payment from the Client for its . . . portion," id. ¶ 147.  "Pursuant to the agreement," Kolmar "submitted invoices to Wormser at the end of 2018 totaling $745,523.87, which reflects two-thirds of the losses."  Id. ¶ 91.  "In . . . email conversations between September 2022 and November 2022, Wormser repeatedly acknowledged that it would share costs from the obsolete Powder Foundation bulk."  Id. ¶ 88.  "To date," though, "Kolmar has not received a single payment from Wormser."  Id. ¶ 93.  Kolmar now seeks payment on breach of contract, promissory estoppel, or quantum meruit theories.  See id. ¶¶ 150, 153, 166.

7

As to the final category, in 2014, Wormser and Kolmar "entered an agreement in which [Kolmar] would secure storage for certain of Wormser's goods" at Wormser's expense.  Id. ¶ 96.  "Between 2014 and August 2020, Wormser paid [Kolmar] for fees arising under the Storage Agreement."  Id. ¶ 96.  In July 2020, Kolmar "updated its storage terms"; the next month, Wormser stopped paying to store its goods.  Id. ¶ 99.  However, Wormser only removed its goods from Kolmar's warehouse "between October 20, 2023 and December 4, 2023."  Id. ¶ 101.  Wormser thus owes storage fees accruing from August 2020 until the removal.  Id. ¶ 102.  Kolmar now seeks these fees under a breach of contract claim.  Id. ¶ 175.

B.  Procedural History

These cases started when Kolmar filed suit against Wormser on November 17, 2024.  See Complaint, filed Nov. 27, 2024 (Docket # 1).  Two months later, Wormser filed suit against Kolmar bringing claims for Kolmar's alleged breach of CIAF Purchase Orders (Count I) and the Supply Agreement (Count II).  See Wormser Compl.  At the parties' request, the Court consolidated the two actions.  See Order, dated Mar. 5, 2025 (Docket # 22).  The parties each filed motions to dismiss under Fed. R. Civ. P. 12(b)(6) on April 30, 2025.  See Wormser Corp.'s Notice of Motion to Dismiss, filed Apr. 30, 2025 (Docket # 30); HK Kolmar USA, LLC's Notice of Motion to Dismiss, filed Apr. 30, 2025 (Docket # 27).  Kolmar then filed an amended complaint, which is now the operative complaint.  See Kolmar Compl.  Wormser filed the instant motion to dismiss Kolmar's amended complaint on July 11, 2025.  See Wormser Corp.'s Notice of Motion to Dismiss, filed July 11, 2025 (Docket # 51).

II.  LEGAL STANDARDS

A party may move to dismiss a complaint under Fed. R. Civ. P. 12(b)(6) where the opposing party's pleading "fail[s] to state a claim upon which relief can be granted."  While a

8

court must accept all of the factual allegations contained in a complaint as true, that principle does not apply to legal conclusions.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 556 U.S. at 678 (citation omitted), and a court's first task is to disregard any conclusory statements in a complaint, id. at 679.

Next, a court must determine if the complaint contains "sufficient factual matter" which, when accepted as true, states a claim that is "plausible on its face."  Id. at 678 (citation and internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (citations and internal quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged — but . . . not 'show[n]' — 'that the pleader is entitled to relief.'"  Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

III. KOLMAR'S MOTION TO DISMISS WORMSER'S COMPLAINT

A. Count I

In Count I, Wormser alleges that Kolmar breached paragraph 8 of the purchase orders' TACs by failing to procure insurance that "covered" L'Oréal's lawsuit.  See Wormser Compl. ¶¶ 130-32.  Wormser also alleges that Kolmar breached paragraphs 8 and 10 by failing to indemnify Wormser from L'Oréal's lawsuit and cover the cost of Wormser's defense.  Id. ¶¶ 133, 135; see Wormser Opp. at 16-17.  The parties agree that, pursuant to the choice of law clause in §

15 of the Supply Agreement, New York law governs Wormser's claims.  See id. ¶ 30; Kolmar Mem. at 7.

To state a claim for breach of contract under New York law, a plaintiff must allege: "(1) the existence of a contract between itself and th[e] defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011); accord 34-06 73, LLC v. Seneca Ins. Co., 39 N.Y.3d 44, 52 (2022).

1.   Whether the TACs Bind Kolmar

We start by addressing how the Uniform Commercial Code ("UCC") would apply to the TACs in the purchase orders that Wormser issued in light of the fact that the parties had previously entered into (and signed) a Supply Agreement.  UCC § 2-209(3) makes clear that any modification to a contract governed by the UCC must satisfy the statute of frauds.  N.Y. U.C.C. § 2-209(3).  There is no allegation that the purchase orders were ever signed by Kolmar.  Thus, the threshold issue we must address is whether the TACs in the purchase orders are enforceable.

Wormser asserts that the purchase orders are "enforceable against [Kolmar] under the [UCC] § 2-201(3)(c)," an exception to the statute of frauds, "because Wormser paid [Kolmar] for the goods and [Kolmar] accepted the payments."  Wormser Compl. ¶ 13.

We begin by noting that the provisions of the Supply Agreement are wide-ranging, and thus appear to govern all aspects of the parties' relationship regarding the production of products — with the exception of the particular product (apparently to be chosen from a list attached to the Supply Agreement) and quantity thereof to be produced.  The Supply Agreement specifically provides that Wormser would direct Kolmar to produce a particular product in some quantity

through a "purchase order."  See Supply Agreement ¶ 4.1 ("Each order for Products purchased pursuant to this Agreement shall be in writing and shall be sent to the address of the party selling the Products . . . (the 'Purchase Order').").  The Supply Agreement contains a number of provisions as to how Kolmar was expected to deliver products ordered through purchase orders, how title to those products would pass under purchase orders, and when payment was due under purchase orders.  Id. ¶¶ 4.2-4.4, 6.1.  The Supply Agreement even contained a clause directing that both sides were to insure products "in accordance with the relevant Purchase Order" for the period "starting on the date of receipt of the Products . . . and terminating when complete payment for such Products is made."  Id. ¶ 4.5.

Section 2-201(3)(c) of the UCC provides in relevant part that, notwithstanding a lack of signature, an otherwise "valid" contract is enforceable "with respect to goods for which payment has been made and accepted."  N.Y. UCC § 2-201(3)(c).  In other words, § 2-201(3)(c) creates an exception to the normal rule that any contract for the sale of goods with a price of more than $500 must be signed.  Id. § 2-201(1).  As the Second Circuit made clear in a case with similar facts, the "[t]he rationale underlying the exception is that '[r]eceipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that a contract actually exists.'"  Dallas Aerospace v. CIS Air Corp., 352 F.3d 775, 782 (2d Cir. 2003) (quoting N.Y. UCC § 2-201 cmt. 2) (alteration in original).

It is not clear, however, that the "rationale" of this exception should govern the situation before us.  To be sure, where there is no pre-existing signed (and therefore binding) contract, an objective observer would look to see whether the non-signatory to an unsigned but otherwise valid agreement proceeded pursuant to its terms and, if so, would make the inference that the non-signatory was agreeing to the unsigned agreement by virtue of its performance.  But where

11

the unsigned agreement does not represent the entire (and only) agreement between the parties but instead is purported to be a modification of a pre-existing signed contract, there is no imperative to determine whether "a contract actually exists." Dallas Aerospace, 352 F.3d at 782 (quoting N.Y. UCC § 2-201 cmt. 2). Here, there is a pre-existing signed contract — the Supply Agreement — that sets forth the obligations of the parties with respect to the subject matter of any given purchase order. By the terms of the Supply Agreement, the purchase order is merely the designated mechanism that Wormser used to communicate a specific order to Kolmar. It is not necessary, therefore, to look for the source of the parties' agreement as is true in the typical situation that arises under § 2-201.

A similar line of reasoning led the Second Circuit in Dallas Aerospace to conclude that a term contained in an unsigned purchase order was not intended to modify the original contract. Dallas Aerospace ruled that a contract for the sale of an engine was not modified through an unsigned purchase order containing a new term transmitted to the seller at the time it accepted payment. See id. at 782-83. The Second Circuit reasoned that "acceptance of payment for the engine was entirely consistent with [the seller's] pre-existing rights and obligations" under the original contract, so "it cannot be said that [the seller's] performance 'constitute[d] an unambiguous overt admission' that the [original] contract had been modified." Id. (quoting N.Y. UCC § 2-201 cmt. 2).

While that reasoning applies here, it can only take us so far since there is at least one potentially important distinction between Dallas Aerospace and our case. In Dallas Aerospace, there was no suggestion that the original contract of sale adverted to the necessity of issuing a purchase order. Thus, it appears that issuance of the purchase order in Dallas Aerospace with its new term was not at all necessary to effectuate the original contract. Here, by contrast, the

12

Supply Agreement specifically contemplated the issuance of purchase orders.  Thus, there is potentially an argument available to Wormser that the parties intended to allow Wormser to issue purchase orders that attached conditions (as long as they were not inconsistent with the Supply Agreement) necessary to effectuate the contract.  If such were the case, it might be inferred that Kolmar accepted those consistent and necessary terms by taking payment under the purchase orders.  In other words, under these conditions, Kolmar's performance might be deemed to have "constitute[d] an unambiguous overt admission" that the Supply Agreement had been modified. Dallas Aerospace, 352 F.3d at 782-83 (alteration in original).

At the same time, we do not believe such a result is inevitable, and additional facts might show that Kolmar had no reason to believe that the purchase orders were effectuating a modification to the Supply Agreement rather than merely effectuating orders contemplated by the Supply Agreement.  One way to think about the problem is to imagine if the purchase orders did not have the TACs on the back.  In such a situation, we would not say that the parties were agreeing to new terms of as a result of the purchase orders.  Instead, we would say that the purchase orders were merely the mechanisms of effectuating the process contemplated by the Supply Agreement.  The fact that Wormser unilaterally added the TACs to the back of the purchase orders might not have indicated to Kolmar that it was accepting those terms.

The potential for two different outcomes in this scenario was ably laid out in the case of Am. Licorice Co. v. Total Sweeteners, Inc., 2013 WL 4396778 (N.D. Cal. Aug. 13, 2013).  In that case, there was a binding sales contract between the parties for the sale of molasses in a certain quantity and at a certain price.  See id. at *1, *7-*8.  Before the first shipment was made, the buyer sent a purchase order that contained conditions that varied the terms of the sales contract, and the seller subsequently delivered the molasses.  See id. at *2-*3.  This occurred a

number of times, but eventually the buyer sued the seller for breach of contract, alleging that some of the product delivered was adulterated and that the seller, inter alia, violated terms contained in the purchase orders. See id. at *3-*4. Notwithstanding the lack of disputed facts as to what occurred, Am. Licorice Co. found that the "parties' actions and intent were ambiguous" with respect to whether the purchase orders were intended to modify their sales contract. Id. at *10. It further held that even if the statute of frauds was not a bar to finding a modification, there would still be a lack of clarity as to whether the terms of the purchase order were intended to modify the original sales contract. Id. As Am. Licorice Co. put it, "there is still a disputed question as to whether Defendant, by shipping the molasses, intended to assent to the terms in the Purchase Order, or whether it sent the shipment intending that the terms of the Sales Contract would govern." Id. Am. Licorice Co. noted that there would still have to be proof that there was "mutual assent" to any new terms in the purchase orders and thus that a factfinder could reach conflicting conclusions on these questions. Id. The court framed the issue as whether "Defendant's action in shipping the molasses evinces a clear intent to modify the contract by adopting the terms in the Purchase Order." Id. at *11. It denied the motion to dismiss because "conflicting inferences as to the parties' intent could reasonably be drawn from the parties' course of conduct." Id.

We agree with the course taken by Am. Licorice Co. In ruling on a motion to dismiss, we are required to "draw[] all reasonable inferences in favor of the plaintiff." Buon v. Spindler, 65 F.4th 64, 76 (2d Cir. 2023) (citing Olson v. Major League Baseball, 29 F.4th 59, 71 (2d Cir. 2022)). With this stricture in mind, we are not prepared to say at this stage that it will be impossible for Wormser to show that the parties intended the TACs in the purchase orders to govern the product delivered pursuant to those purchase orders. At the same time, Kolmar may

14

be able to show that its fulfillment of the purchase orders without objecting to the TACs reflected only its reasonable belief that Wormser was operating according to the Supply Agreement and that the purchase orders served merely to identify the product and quantity to be manufactured. After all, the Supply Agreement contemplated the issuance of purchase orders but contained no specific language requiring that they be acknowledged or agreed to in order to be effective. In this context, Kolmar may be able to argue that its lack of objection was reflective only of its intent to fulfill the terms of the Supply Agreement.

Whether the Supply Agreement is a contract for services (governed by the common law, as Kolmar argues, see Kolmar Mem. at 16-18) or a contract for goods (to which the UCC applies, as Wormser argues, see Wormser Opp. at 21) does not affect the outcome. Certainly, as Wormser points out, New York common law recognizes that "when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree." Register.com Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004); see Wormser Opp. at 21-22. But this is essentially the principle articulated in UCC § 2-201(3)(c). And New York law similarly recognizes that whether a contract has been formed centers on the intent of the parties. See, e.g., Wu v. Uber Techs., Inc., 43 N.Y.3d 288, 298 (2024) ("To form a binding contract under New York law, it is often said that 'there must be a "meeting of the minds."'"). Here, whether performance following receipt of the purchase orders reflected that there was a mutual intent to incorporate any of the TACs cannot be determined based on the allegations of Wormser's complaint for the same reasons already stated: namely, that Kolmar might reasonably have understood that the effect of the purchase orders was simply to implement

15

what was agreed to in the Supply Agreement and that they were not intended to add new and material terms and obligations.

Finally, we reject Wormser's argument that a statement in Kolmar's own complaint bars it from arguing that it was not bound by the TACs, whether because of judicial estoppel or N.Y. Gen Oblig. Law § 5-701(b)(3)(c).  See Wormser Opp. at 18-20.  The statement at issue — that Kolmar had "accepted" the purchase orders, see Kolmar Compl. ¶ 68 — is consistent with its position that it acted to fulfill those purchase orders in accordance with the Supply Agreement but was not bound by the TACs.

We turn next to the specific TACs which Wormser alleges were breached.

2.  Paragraph 10

Wormser alleges that Kolmar failed to comply with paragraph 10 of the TACs, which obligates Kolmar to "indemnify [Wormser] & save [Wormser] harmless from any & all liability, demands, causes of action or claims, whether well founded or otherwise, including the cost of defending the same, for bodily injury to any person or damage to property, either real or personal, of any person."  Wormser Compl. ¶ 70; see id. ¶ 133.  New York law requires an indemnity provision such as this to be "strictly construed."  Hooper Assoc. v. AGS Computers, 74 N.Y.2d 487, 491 (1989).  Thus, such a provision "should not be extended to include damages which are neither expressly within its terms nor of such character that it is reasonable to infer that they were intended to be covered under the contract."  Niagara Frontier Transp. Auth. v. Tri-Delta Constr. Corp., 107 A.D.2d 450, 453 (4th Dep't 1985), aff'd, 65 N.Y.2d 1038 (1985).

Here, Wormser does not seek damages for "bodily injury to any person or damage to property."  Instead, it seeks the money it lost as a result of having to defend against and settle

16

L'Oréal's lawsuit.  See Wormser Compl. ¶ 133.  Thus, on its face, paragraph 10 does not apply to the losses Wormser seeks.

Moreover, New York courts have specifically held that an obligation to indemnify for "property damage" does not provide for indemnification of economic losses.  See, e.g., George A. Fuller Co. v. United States Fid. & Guar. Co., 200 A.D.2d 255, 259 (1st Dep't 1994) (requirement to indemnify for "property damage" was "never intended to provide contractual indemnification for economic loss to a contracting party because the work product contracted for is defectively produced").  The same logic obviously applies to the term "bodily injury."  Kolmar specifically adverts to this case law, see Kolmar Mem. at 10, but Wormser in its opposition simply ignores it.

Thus, Kolmar did not breach of Paragraph 10 of the TACs.

3.   Paragraph 8

The first sentence of paragraph 8 obligates Kolmar to "maintain all necessary insurance coverages, including public liability & Workman's Compensation insurance."  Wormser Compl. ¶ 69.  The second sentence of paragraph 8 obligates Kolmar to "indemnify and save harmless and defend [Wormser] from any & all claims or liabilities arising out of work covered by this paragraph."  Id. ¶ 69.  Because the indemnification language in the second sentence is limited to "work covered by this paragraph," and the second sentence gives no indication of what that "work" is, we view the scope of paragraph 8 as depending upon the first sentence's meaning.

Wormser asserts that the obligation to maintain "all necessary insurance coverages" required Kolmar to take out "Manufacturer's E&O [Errors and Omissions] insurance" ("MEO") that would have covered "L'Oréal's breach of warranty claims."  Wormser Opp. at 1; see also Wormser Compl. ¶ 132 (alleging that Kolmar breached paragraph 8 because it "never procured

17

insurance to cover the L'Oréal Suit").  Kolmar seeks to dismiss this claim on the ground that paragraph 8 required it to purchase "public liability," "Workman's Compensation," or other "similar kinds of insurance policies" — but not an MEO insurance policy.  Kolmar Mem. at 13.

We begin by addressing general principles of contract interpretation under New York law. As the New York Court of Appeals has held:

> Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole. The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning.
>
> An agreement is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion. Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or when specific language is susceptible of two reasonable interpretations.

Ellington v. EMI Music, Inc., 24 N.Y.3d 239, 244-45 (2014) (citations, internal quotation marks, and alternations omitted).  And "if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim."  Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 178 (2d Cir. 2004).

Here, the term "necessary" is ambiguous as used in paragraph 8.  "The word 'necessary' is susceptible of various meanings," Ferguson Contracting Co. v. State, 70 Misc. 472, 483 (Ct. Cl. 1911), aff'd, 202 A.D. 27 (3d Dep't 1922), modified, 203 A.D. 837 (3d Dep't 1922), aff'd, 237 N.Y. 186 (1923), and "has always been recognized as a word to be harmonized with its context," Armour & Co. v. Wantock, 323 U.S. 126, 129-30 (1944); see also Krause v. Titleserv, Inc., 402 F.3d 119, 128 (2d Cir. 2005) ("the word 'necessary' is ambiguous"); Lopez v. Consolidated Edison Co. of N.Y., 40 N.Y.2d 605, 609 (1976) (noting the "ambiguous nature" of the contractual terms "necessary and proper").  While an expert or the parties' course of dealing

18

(or perhaps Wormser's efforts to have other subcontractors comply with paragraph 8) might shed light on the term's meaning, no such evidence is before us.  The only possible clues to the meaning of "necessary" in this context are the examples provided in paragraph 8 itself, that is, the phrase "including public liability & Workman's Compensation insurance."

Kolmar contends this phrase confines the meaning of "necessary" to "public liability or Workman's Compensation insurance policies . . . or similar kinds of insurance policies."  Kolmar Mem. at 13.  We agree.

We do not reach this conclusion, however, by relying on "the rule of ejusdem generis," as Kolmar argues.  Id. at 12 (quoting Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co., 136 A.D.3d 52, 57 (1st Dep't 2015), aff'd on other grounds, 28 N.Y.3d 675 (2017)).  "Under the rule of ejusdem generis, 'a series of specific words describing things or concepts of a particular sort are used to explain the meaning of a general one in the same series.'"  Olivieri v. Barnes & Noble, Inc., 211 A.D.3d 1525, 1528 (4th Dep't 2022) (quoting 242-44 E. 77th St., LLC v. Greater N.Y. Mut. Ins. Co., 31 A.D.3d 100, 104 (1st Dep't 2006)); see also Ejusdem Generis, Black's Law Dictionary (12th ed. 2024) (defining the rule as "holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed").  In paragraph 8, there is no "general" word that follows specific words.  Further, the word needing interpretation — "necessary" — is not in the same list or series as "public liability & Workman's Compensation insurance."  Instead, "public liability & Workman's Compensation insurance" are provided as examples of what kinds of insurance are "necessary."  Accordingly, the doctrine of ejusdem generis has no application.

Kolmar also invokes the broader principle of noscitur a sociis when it cites to 327 Realty, LLC v. Nextel of N.Y., Inc., 150 A.D.3d 581, 582 (1st Dep't 2017), for the proposition that

19

"[w]here a contract provides an example to describe a term, condition, or event, 'that example defines the type of event that will fulfill that condition.'"  Kolmar Mem. at 12; see also Kolmar Reply at 5 (citing to Team Mktg. USA Corp. v. Power Pact, LLC, 41 A.D.3d 939, 942-43 (3d Dep't 2007), for a similar proposition).  We agree that this principle applies here as an aid to interpretation.  "Noscitur a sociis is an old fundamental maxim which summarizes the rule both of law and of language that associated words explain and limit each other."  Popkin v. Security Mut. Ins. Co. of N.Y., 48 A.D.2d 46, 48 (1st Dep't 1975) (internal quotation marks omitted).  By way of illustration, in Team Mktg. USA Corp., a marketing contract permitted cancellation "if Promotion is not able to take place or [plaintiff] is rendered unable to timely perform . . . for any reason, including, without limitation, strikes, boycotts, war, Acts of God, labor troubles, riots, and restraints of public authority." 41 A.D.3d at 942.  The court held that the broad phrase "any reason" had to be interpreted in accordance with the examples that followed the phrase "including, without limitation." See id. at 943.  Thus, the marketing contact could be cancelled only for a reason "similar in nature" to "the specifically enumerated events." Id.  Here, because "public liability & Workman's Compensation insurance" are given as examples of "necessary insurance coverages," it follows that "necessary insurance coverages" must be similar in nature to public liability or Workman's Compensation insurance.

Wormser is incorrect to say that this interpretation would "render[] language in the contract superfluous" by equating "necessary insurance converges" with "public liability & Workman's Compensation insurance."  Wormser Opp. at 13 (citing Century Sur. Co. v. Euro-Paul Constr. Corp., 2017 WL 4338790, at *7 (E.D.N.Y. Sept. 29, 2017)).  Obviously, the requirement that Kolmar "maintain all necessary insurance coverages, including public liability & Workman's Compensation insurance" potentially required Kolmar to maintain more than

20

"public liability & Workman's Compensation insurance."  See id. at 11.  "The word 'including,' when followed by a list of examples, is designed to broaden the concept being defined."  Matter of Doniger v. Rye Psychiatric Hosp. Ctr., 122 A.D.2d 873, 877 (2d Dep't 1986); see also Seymour v. Hovnanian, 211 A.D.3d 549, 553 (1st Dep't 2022) ("The phrase, 'including claims for personal injury or property damages sustained by any contractor, worker, or any other third or non-party,' necessarily indicates that the provision is broader than third-party claims.").  On the other hand, the scope of the term "necessary" is not so broad as to encompass any given form of insurance.  Instead, the term includes only those forms of insurance similar in nature to public liability or Workman's Compensation insurance.

We next consider whether MEO insurance — or any insurance which would have covered Kolmar's liability to L'Oréal — is similar in nature to public liability or Workman's Compensation insurance.  Workman's Compensation insurance covers "injuries occurring in the scope of employment."  Workers' Compensation, Black's Law Dictionary (12th ed. 2024).  "Public liability insurance" by contrast is a "very broad term for insurance covering liability exposures for individual and business owners . . . generally including all exposures for property damages and bodily injury."  Harvey W. Rubin, Dictionary of Insurance Terms 410 (4th ed. 2000); see also Insurance, Black's Law Dictionary (11th ed. 2019) (defining public liability insurance as covering "loss resulting from the insured's liability to a third party, such as a loss incurred by a driver who injures a pedestrian").  These forms of insurance seem to cover losses of a character (i.e., relating to personal injury or property damages) different from Kolmar's liability to L'Oréal.  See Wormser Compl. ¶ 131.  At the same time, the available definitions of "public liability insurance" are not clearly limited to insurance policies covering personal injury or property damage.  While we think it highly likely that expert testimony might elucidate the

21

question of what this term meant to a person knowledgeable in the field of insurance, obviously no such testimony is before us on this motion to dismiss. As a result, we cannot say on the record before us that, as a matter of law, MEO insurance (or any insurance which would have covered Kolmar's liability to L'Oréal) is beyond the scope of the term "necessary."

Given this analysis, we of course reject Wormser's arguments that the term "necessary" unambiguously obligated Kolmar to procure MEO insurance. Wormser argues that the meaning of the term "necessary" is elucidated by a lawsuit Kolmar filed against its insurance broker for failing to procure MEO insurance. See Wormser Compl. ¶¶ 131-32; Wormser Opp. at 1, 5, 9-10, 17. In that lawsuit, we are told, Kolmar alleged that its insurance broker improperly failed to procure such insurance. See Wormser Compl. ¶ 131. But there is nothing in Wormser's complaint connecting this lawsuit with Kolmar's purported obligations under paragraph 8. Kolmar's insurance broker might have been obligated to procure MEO insurance even if there had been no paragraph 8.

Wormser also argues that MEO insurance was "necessary" because it was "needed, considering the potentially massive exposure that Kolmar and Wormser faced from lawsuits." Wormser Opp. at 9. This argument begs the question. Something is necessary if it is "needed for some purpose or reason." Necessary, Black's Law Dictionary (12th ed. 2024). Wormser simply assumes that the purpose of paragraph 8 was to hedge against "the potentially massive exposure that Kolmar and Wormser faced from lawsuits" and thus that MEO insurance was necessary. Wormser Opp. at 9. But the scope of the term "necessary" in paragraph 10 is unclear for the reasons already discussed.

Accordingly, the motion to dismiss Count I is denied.

22

B. Count II

Count II alleges that Kolmar breached § 2.2 of the Supply Agreement. Section 2.2 provides:

> [Kolmar] hereby agrees and undertakes to sell to Wormser, and Wormser agrees and undertakes to purchase from [Kolmar], for the price and subject to the terms and conditions contained herein, the total requirements for Services needed by Wormser for its day-to-day manufacturing and distributing activities during the term of this Agreement.

Supply Agreement ¶ 2.2. Wormser alleges that Kolmar failed to satisfy Wormser's total requirements "because L'Oréal terminated its contract with Wormser to supply CIAF" upon determining that Kolmar could not competently manufacture CIAF. Wormser Compl. ¶ 139. After L'Oréal terminated the CIAF contract, Wormser could not "sell to L'Oréal more than 1.5 million units of CIAF that L'Oréal had ordered," rendering "worthless" some $1.1. million in parts "purchased for the manufacturing of CIAF." Id. ¶ 143-44. Wormser thus contends that "Kolmar breached the Total Requirements Clause in the Supply Agreement because it was unable to fulfill orders for CIAF." Wormser Opp. at 24.

This claim fails because Wormser's complaint provides no allegations showing how Kolmar breached the Supply Agreement. Instead, it alleges that once L'Oréal terminated the CIAF contract, Wormser had no orders for CIAF to fulfill.

Certainly, we accept the allegations that L'Oréal had ordered more than 1.5 million units of CIAF from Wormser and that Wormser could not ask Kolmar to fulfill this order because L'Oréal had found Kolmar to be an unsuitable supplier. See Wormser Compl. ¶¶ 139, 143. But Wormser's complaint at no point alleges that it indicated to Kolmar, through a purchase order or otherwise, that it had particular "requirements for Services" from Kolmar and that Kolmar failed to "sell" these requirements — the only obligation Kolmar undertook in § 2.2. Instead,

23

Wormser's complaint reflects that as of April 8, 2019, when L'Oréal suspended the CIAF

contract (before ultimately terminating it on May 10, 2019), Wormser's "requirements for

Services" from Kolmar in relation to CIAF dropped to zero.  Wormser Compl. ¶¶ 94, 111.

Plainly, Kolmar was not obligated to "sell to . . . Wormser" particular "requirements for Services

needed by Wormser" when Kolmar's "Services" were no longer required.  Id. ¶ 82.  The Supply

Agreement contains no clause that binds Kolmar to ensure that Wormser is in a position to

generate requirements.  Thus, Kolmar did not breach § 2.2 of the Supply Agreement.

In Count II, Wormser makes allegations regarding the quality of CIAF produced by

Kolmar.  See Wormser Compl. ¶ 142 ("[Kolmar] breached Section 2.2 of the Supply Agreement

because [Kolmar] was unable to fill Wormser's orders for CIAF because L'Oréal determined that

[Kolmar] lacked the skill, experience[,] and equipment to manufacture a quality liquid

foundation.").  But §2.2 of the Supply Agreement concerns the quantity of CIAF produced by

Kolmar.  See N.Y. UCC § 2-306(1) ("A term which measures the quantity by . . . the

requirements of the buyer means such actual . . . requirements as may occur in good faith").

Section 2.2 does not permit Wormser to sue for its complaints about the quality of CIAF.  See

Negrete v. Citibank, N.A., 187 F. Supp. 3d 454, 468 (S.D.N.Y. 2016), aff'd, 759 F. App'x 42 (2d

Cir. 2019) ("plaintiffs must at least allege . . . the relevant breached provisions of th[e]

contract.").  The Supply Agreement has separate provisions for how Wormser was to obtain relief

regarding complaints about quality.  See Supply Agreement §§ 8.2, 8.3.  Wormser does not seek

to invoke those provisions.  Indeed, Wormser never alleges that it complied with those

provisions.

Accordingly, Count II fails to state a claim upon which relief can be granted.

IV.    WORMSER'S MOTION TO DISMISS KOLMAR'S COMPLAINT

    A.    Counts I-III (CIAF-Related Claims)

        1.    Statute of Limitations

Wormser argues Kolmar's CIAF-related claims are barred by the relevant statute of limitations.  See Wormser Mem. at 6.  "[A] statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  Ellul v. Congregation of Christian Bros., 774 F.3d 791, 798 n.12 (2d Cir. 2014).

        a.    Whether the Statute of Limitations Argument is Properly Raised

Before addressing this argument, we take up Kolmar's argument that that Wormser waived any statute of limitations defense under Fed. R. Civ. P. 12(g)(2) because "Wormser's motion to dismiss [Kolmar's] original complaint did not raise any statute of limitations defenses to these claims."  Kolmar Opp. at 10.  Under Rule 12(g)(2), a party "that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion," subject to certain exceptions not relevant here.  Fed. R. Civ. P. 12(g)(2).  As one case has noted, "the greater weight of case law in this District suggests that failure-to-state-a-claim arguments are not waivable and may be brought in a successive Rule 12 motion."  Ballast v. Workforce7 Inc., 2024 WL 307966, at *5 (S.D.N.Y. Jan. 25, 2024), reconsideration denied, 2024 WL 1530654 (S.D.N.Y. Apr. 8, 2024); see also Ennenga v. Starns, 677 F.3d 766, 773 (7th Cir. 2012) ("[A] statute-of-limitations defense is not waived if raised for the first time in a successive motion to dismiss.").  We do not reach this question, however, because the only effect of enforcing the terms of Rule 12(g)(2) in this instance would be to permit Wormser to re-label its motion as a motion for judgment on the pleadings under Rule 12(c) or a motion for summary judgment on this narrow issue under Rule

56. Because there would be no bar to this Court's considering such a motion, we elect to construe this branch of the argument as arising under Rule 12(c) or a motion for summary judgment under Rule 56 to the extent it might be deemed necessary to do so given that Kolmar would suffer no prejudice from our so proceeding. See Edmondson v. Raniere, 2025 WL 1755843, at *2 (E.D.N.Y. June 25, 2025) (declining to require party to refile a statute of limitations argument brought in a second Rule 12(b)(6) motion as a Rule 12(c) motion in order to "spare the parties (and the Court) another round of likely repetitive briefing").

We turn next to merits of Wormser's limitations argument.

b. When the CIAF-Related Claims Accrued

Under New York's borrowing statute, a cause of action accruing outside of New York must satisfy both New York's statute of limitations and the statute of the limitations of the place where the cause of action accrued. See N.Y. C.P.L.R. § 202. New York's statute of limitations provides that a breach of contract, promissory estoppel, or quantum meruit claim must be brought within six years. See N.Y. C.P.L.R. § 213(2); Rapay v. Chernov, 2017 WL 892372, at *7 (S.D.N.Y. Mar. 6, 2017). The parties assume that Kolmar's CIAF-related claims accrued in Pennsylvania. See Wormser Mem. at 7; Kolmar Opp. at 12. Pennsylvania's statute of limitations provides that a breach of contract, promissory estoppel, or quantum meruit claim must be brought within four years. See 42 Pa. Cons. Stat. § 5525(a); Perelman v. Perelman, 2013 WL 1842234, at *7 (E.D. Pa. May 2, 2013), aff'd, 545 F. App'x 142 (3d Cir. 2013).

Wormser argues that Kolmar's CIAF-related claims accrued "no later than May 2019," Wormser Mem. at 8, and because Kolmar brought suit in November 2024, over four years later, these claims are time-barred under Pennsylvania's statute of limitations, see id. at 6. Kolmar argues that its claims did not accrue in May 2019. See Kolmar Opp. at 12.

Strangely, Kolmar does not point to an alternative date on which Counts I and II (breach of contract and promissory estoppel) accrued.  See id.  Kolmar states that these claims accrued when it "demanded payment and Wormser did not pay."  Id. (citing McGaffic v. City of New Castle, 973 A.2d 1047, 1052 (Pa. Commw. Ct. 2009)).  However, Kolmar alleges that it demanded payment on May 21, 2019.  See Kolmar Compl. ¶¶ 118, 131.

As for Count III (for quantum meruit), such a claim does not accrue until "the date on which the relationship between the parties is terminated."  Cole v. Lawrence, 701 A.2d 987, 989 (Pa. Super. Ct. 1997).  Kolmar argues that its relationship with Wormser did not terminate until June 2024, pointing to an allegation so stating in the complaint.  Kolmar Opp. at 13 (citing Kolmar Compl. ¶ 94).  That allegation is conclusory, however.  Moreover, it does not matter when the parties' overall relationship terminated (i.e., when they stopped doing business with respect to products other than CIAF).  Rather, what matter is when their relationship terminated with respect to Kolmar's claim for quantum meruit, that is, with respect to the manufacture of CIAF.  See Kenis v. Perini Corp., 682 A.2d 845, 849 (Pa. Super 1996) (claim for services rendered accrued when one party terminated the services of the other).  Here Kolmar's complaint reflects that the parties' relationship with respect to the manufacture of CIAF terminated when Wormser "cancelled the Relevant Purchase Orders."  Kolmar Compl. ¶ 71.  That cancellation occurred in April 2019.  Id.

        c.   Effect of Tolling Agreement

This action was not filed until 2024, more than four years after the claims accrued. Kolmar contends, however, that the parties entered into an agreement in 2021 that tolled the statute of limitations on its CIAF-related claims for a period of two years (the "Tolling Agreement").  Kolmar Opp. at 11-12; see Kolmar Sur-Reply.

27

On August 30, 2021, Kolmar and Wormser executed the Tolling Agreement after both were sued by L'Oréal.  See Tolling Agreement, annexed as Ex. A to 2d Rosa Decl. (filed at Docket # 59-1).[2]  The Tolling Agreement contains the following recitals:

> WHEREAS, Wormser believes it may have claims against [Kolmar] arising out of . . . [L'Oréal's] Action (the "Dispute");
>
> WHEREAS, [Kolmar] denies that it has any fault or liability for the Dispute;
>
> WHEREAS, the Parties wish to continue to defend the Action and to determine a prudent resolution of the Dispute at a later time, provided that the rights of the Parties are not prejudiced due to any statute of limitations[-]related defenses that may be asserted as to any of the claims Wormser may assert . . . ("Claims");
>
> WHEREAS, during the period in which the Action is pending, including any subsequent negotiations or resolution, the Parties wish to toll any applicable statutes of limitations or similar defenses, and to provide for the retention of any legal or equitable actions or defenses that the Parties may have, and to provide that no . . . action may be initiated by or on behalf of the Parties against one another during the term of this Agreement.

Tolling Agreement at 1.  The parties agreed to toll "any applicable statute of limitations applicable to the Claims" during the period from August 30, 2021, to August 30, 2023 (the "Tolling Period").  Id. ¶ 1.  The parties also agreed "that they will not interpose in any lawsuit or action between the Parties related to the Claims any defense that the statute of limitations expired during the Tolling Period or based on the passage of time during the Tolling Period."  Id. ¶ 3.

Wormser makes essentially two arguments that the Tolling Agreement does not apply.[3]

---

[2] While this document is not referenced in Kolmar's complaint, the Court may consider it under Fed. R. Civ. P. 12(d) inasmuch as neither party disputes that the Tolling Agreement filed by Kolmar is authentic, and Wormser does not object to our considering it.

[3] Kolmar suggests that we can overlook the definition of "Claims" in the Tolling Agreement because it is provided in a "WHEREAS clause" (as opposed to an "operative clause").  See Kolmar Opp. at 11 n.3.  We reject this argument because the "WHEREAS" clause provides the only definition of "Claims," and the term "Claims" is then used in the "operative" clauses of the Tolling Agreement. See, e.g., Tolling Agreement ¶¶ 1-4, 6.

First, Wormser points to the fact that the definition of "Claims" is limited to "claims Wormser may assert."  Tolling Agreement at 1 (emphasis added); see Wormser Reply at 8; Wormser Resp. at 1.  In Wormser's view, this means that the agreement applies only to claims brought by Wormser, not by Kolmar.  See Wormser Reply at 8; Wormser Resp. at 1.  We reject this argument for several reasons.  First, another recital states that the purpose of the agreement is "to provide for the retention of any legal or equitable actions or defenses that the Parties may have."  Tolling Agreement at 1.  Second, several numbered clauses in the text of the agreement similarly refer to both parties benefiting from the tolling period.  See id. ¶ 2 ("[t]he Parties shall forbear and postpone the filing" of any action "related to the Claims"); id ¶ 3 (tolling period not to be counted for purposes of any doctrine that limits "any Party's right" to prosecute a claim).

Focusing on the fact that any tolling applies to a lawsuit or action "related to the Claims," Tolling Agreement ¶ 3, Wormser also argues that Kolmar's CIAF-related claims are not actually "related to" its own claims against Kolmar.  Wormser Resp. at 2.  Wormser insists that this language cannot mean refer to "CIAF generally" but instead to those claims brought by Wormser.  Id.  Because Kolmar's CIAF-related claims are not related to the two claims in Wormser's lawsuit, Wormser asserts, they are not covered by the Tolling Agreement.  Id.

We reject the argument that the parties intended the term "Claims" to refer only to claims that Wormser would make at some later date, as Wormser seems to argue.  Id.  The recital which defines the term "Claims" makes clear that "Claims" refers to claims that Wormser "may" assert against Kolmar "arising out of the [L'Oréal] Action."  Tolling Agreement at 1.  Thus, Kolmar need only show that its claims relate to the claims Wormser might have brought "arising out of" the L'Oréal lawsuit.  The phrase "related to" — particularly in combination with "arising out of" — is extraordinarily broad.  See Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 20

29

(2d Cir. 1995) ("The clause . . . '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is the paradigm of a broad clause.") (alternation in original).

We do not decide definitively, however, whether the Tolling Agreement covers the claims in question.  Certainly, there are arguments that Kolmar's CIAF-related claims, which revolve around Wormser's alleged failure to pay for damages from cancelled purchase orders, are not "related to" the claims in L'Oréal's lawsuit about the parties' failure to produce CIAF as ordered.  But at this stage of the proceeding, the question is not whose reading of the Tolling Agreement is likely to prevail but whether the phrase "related to" could be potentially read to cover Kolmar's claims — that is, whether the phrase "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."  L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010) (citation and internal quotation marks omitted).  We have no information regarding what issues the parties believed in 2021 were or might have been raised by L'Oréal's lawsuit.  "Unless for some reason an ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings."  Eternity Glob. Master Fund Ltd., 375 F.3d at 178.  In light of this principle, we are not prepared at this stage to say that the phrase "related to" in the Tolling Agreement necessarily excludes Kolmar's CIAF-related claims.  See Subaru Distributors Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005) ("[A]t this procedural stage, we should resolve any contractual ambiguities in favor of the [non-moving party].") (citation omitted).

Wormser does not dispute that if the Tolling Agreement applies, then Counts I, II, and III are not barred by the statute of limitations.  Accordingly, the Court will not dismiss those counts on the ground they are barred by the limitations period.

30

We now turn to the substance of Kolmar's CIAF-related claims.

2.  Breach of Contract, Promissory Estoppel, and Quantum Meruit (Counts I, II, and III)

Count I alleges that Wormser breached either the "Relevant Purchase Orders," Kolmar Compl. ¶ 120, or "an agreement between the parties formed by the parties' conduct and course of dealings," id. ¶ 122.  Kolmar seeks to recover "more than $1.6 million in raw materials, bulk product, and finished goods that [it] purchased and/or manufactured in reliance on Wormser's Relevant Purchase Orders for CIAF and/or an agreement formed by the parties' conduct and course of dealings," id. ¶ 119, along with "$62,100 in storage fees related to CIAF," id.

We see nothing in Kolmar's complaint that elucidates why the parties "conduct and course of dealings" reflect any contractual arrangement as to who should pay for raw materials, bulk product, or finished goods that Kolmar purchased in preparation of fulfilling the Supply Agreement or purchase orders, or as to the storage of CIAF components supplied by Wormser. Accordingly, we look only to the "Relevant Purchase Orders."

To state its breach of contract claim, Kolmar points to a provision of the purchase orders providing that Wormser "reserve[d] the right to cancel or delay an order with liability at any time, in which case the Seller would be asked to provide supporting documentation of such liability & credit that liability upon future consumption."  Id. ¶ 41 (emphasis added).  A separate clause provided "three limited circumstances" under which Wormser would be permitted to cancel an order "without liability": "(1) 'if [Kolmar] fails to meet contract commitments related to time, price, quality & quantity'; (2) 'if [Kolmar] is unable to produce goods in previously approved factory'; or (3) 'within one week of original order placement.'"  Id. ¶ 40.  Kolmar asserts that none of these "without liability" exceptions applied with respect to Wormser's cancellation of purchase orders.  Id. ¶ 74.

31

Wormser argues that Count I fails because the complaint does not allege how Wormser allegedly breached the parties' contract, an element of a breach of contract claim.  See Wormser Mem. at 12 (citing Diesel Props S.r.l., 631 F.3d at 52).  It takes some unpacking to get to the heart of Wormser's argument.  Wormser's logic appears to be that the allegations of Kolmar's complaint show that Wormser's conduct fits within the purchase orders' "without liability" clause — thus dooming any breach of contract claim.  See Wormser Mem. at 13.  Wormser's brief is unclear as to which of the three "without liability" exceptions is purportedly pleaded in Kolmar's complaint.  Wormser appears to be relying on the exception that allowed Wormser to cancel purchase orders if Kolmar failed to meet contractual commitments related to "quality." See id.  Ultimately, Wormser's argument seems to be that Kolmar's allegations (1) that L'Oréal complained about the quality of CIAF, see Kolmar Compl. ¶ 57, and (2) that Wormser cancelled the purchase orders the same day, see id. ¶ 58, add up to an admission that Kolmar failed to meet contractual commitments related to "quality" within the meaning of the purchase orders' "without liability" clause.  See Wormser Mem. at 13.[4]  The Court rejects this argument.  That Kolmar's complaint references statements or actions by L'Oréal about the quality of CIAF does not mean that it pleads Kolmar failed to meet its commitments as to quality.  Kolmar's complaint makes no such allegations.

Wormser separately suggests that Count I is premised on a flawed argument, namely, that, because Wormser failed to object to the quality of the goods "not yet delivered or manufactured," Wormser "accepted" those goods.  Wormser Mem. at 14.  This is a straw man.  The paragraph of Kolmar's complaint which Wormser takes issue with is best read as alleging that Wormser's past

---

[4] We note that here, and in numerous other instances, Wormser's brief fails to provide citations for factual statements it makes in contravention of the requirements of ¶ 2.D of this Court's Individual Practices.

acceptance of goods shows that there was no problem with the "quality" of those <u>prior</u> goods and thus that Kolmar did not trigger the "without liability" exception allowing Wormser to cancel purchase orders if Kolmar failed to meet contractual commitments related to "quality."  <u>See</u> Kolmar Compl. ¶ 73.  In other words, Kolmar is not alleging or arguing that Wormser accepted goods that were never delivered.[5]

Wormser also argues that Kolmar failed to satisfy a "condition precedent" to payment, pointing to clauses in the Supply Agreement that required Kolmar to invoice for and deliver goods.  <u>See</u> Wormser Mem. at 15-18.  This argument is easily dealt with as Kolmar makes no claim to payment for delivered goods.  Instead, Kolmar claims that the purchase orders' "with liability" clause entitles it to the payment it seeks.  Wormser makes no argument that, if the "without liability" exceptions are not met, it would not be responsible under the "with liability" clause for the payment Kolmar seeks.

For these reasons, the motion to dismiss Count I is denied.

As for Count II, a claim of promissory estoppel requires allegations of "(1) a promise that is sufficiently clear and unambiguous; (2) reasonable reliance on the promise by a party; and (3) injury caused by the reliance."  <u>MatlinPatterson ATA Holdings LLC v. Federal Express Corp.</u>, 87 A.D.3d 836, 841-42 (1st Dep't 2011) (citations omitted).  As for Count III, a claimant seeking quantum meruit must establish "(1) the performance of services in good faith, (2) the acceptance

---

[5] Wormser argues in a footnote that Kolmar's complaint also alleges that Kolmar's factory was not "approved" — a separate "without liability" exception.  Arguments made in footnotes, however, need not be addressed by the Court.  <u>See</u>, <u>e.g.</u>, <u>Phoenix Light SF Ltd. v. Bank of N.Y. Mellon</u>, 2017 WL 3973951, at *20 n.36 (S.D.N.Y. Sept. 7, 2017) ("Courts have routinely declined to consider arguments mentioned only in a footnote on the grounds that those arguments are inadequately raised.") (citation omitted); <u>In re Crude Oil Commodity Litig.</u>, 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 8, 2007) ("Arguments which appear in footnotes are generally deemed to have been waived.") (citation omitted).  In any event, Wormser fails to cite to any language in Kolmar's complaint to support its argument.

of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (citation and internal quotation marks omitted).

Kolmar's promissory estoppel and quantum meruit claims run headlong into the principle in New York law that "the existence of valid and enforceable written contracts precludes recovery" under causes of action sounding in promissory estoppel and quantum meruit which "arise out of the same subject matter" as a written contract. Grossman v. New York Life Ins. Co., 90 A.D.3d 990, 991-92 (2d Dep't 2011); accord Hoeg Corp. v. Peebles Corp., 153 A.D.3d 607, 610 (2d Dep't 2017). We accept that a party may plead a promissory estoppel claim or quantum meruit claim in the alternative if there is a dispute over the "existence, scope, or enforceability" of the governing contract. Goldberg v. Pace Univ., 88 F.4th 204, 214-15 (2d Cir. 2023) (citation and internal quotation marks omitted). The question thus becomes whether Wormser is disputing the existence, scope or enforceability of the purchase orders in relation to Kolmar's claims.

Kolmar argues that "Wormser has not conceded the existence of an enforceable contract that governs canceled orders or the payment of invoices for the manufacturing of bulk product or the purchase of raw materials that did not result in finished goods." Wormser Opp. at 23-24 (emphasis added). "[I]n fact," Kolmar adds, Wormser "insist[s]" it is "not liable for these services and raw materials under the governing agreements." Id. at 24. But whether a plaintiff may plead a claim in the alternative does not depend on whether the defendant denies liability for the particular claim. Here, Wormser obviously does not dispute the existence and enforceability of the purchase orders and Supply Agreement. See generally Wormser Mem at 11-20. It also agrees that the purchase orders contained terms that governed the effect of a cancellation: i.e., the

34

"with liability" provision and the "without liability" exceptions.  See id. at 12-15.  Apparently, Kolmar is arguing that Wormser must be disputing the "scope" of the contractual provisions.  We reject this contention.  To be sure, Wormser argues that Kolmar's complaint fails to allege a breach of contract.  But this does not mean that it disputes the "scope" of the purchase orders and Supply Agreement.  The test of "scope" under New York law is whether the claim for promissory estoppel or quantum meruit "arise[s] out of the same subject matter" as the written contract, Grossman, 90 A.D.3d at 992 — not whether the plaintiff can in fact obtain recovery for its claim under the written contract.  Here, the purchase orders and Supply Agreement plainly cover the production of CIAF, with the purchase orders specifically covering cancellations.  And the steps involved in producing CIAF — including manufacturing bulk product and purchasing raw materials — were obviously known to the drafters as being necessary to for Kolmar to fulfill its obligations under the purchase orders and Supply Agreement.  See, e.g., Kolmar Compl. ¶ 48 ("In reliance on Wormser's list of orders . . . Kolmar purchased raw bulk materials to create the CIAF shade(s) sought in Wormser's order.").  Thus, Kolmar's claims for damages relating to the production of CIAF arise out of the same subject matter as the purchase orders and Supply Agreement.  As a result, Counts II and III cannot proceed.  See, e.g. LanzaTech Glob., Inc. v. Vellar Opportunity Fund SPV LLC, 2025 WL 2323834, at *6 (S.D.N.Y. Aug. 12, 2025) ("While [plaintiff] is allowed to plead in the alternative, its unjust enrichment claim arises from the same subject matter covered by the contract.").[6]

---

[6] While LanzaTech Glob., Inc. refers to unjust enrichment, "[quantum meruit] is merely the means by which [unjust enrichment] is remedied." Strauss v. Hearst Corp., 1988 WL 18932, at *9 (S.D.N.Y. Feb. 19, 1988) (citation omitted).

B.  Count IV (Common-Law Indemnity for L'Oréal Liability)

The parties' briefs assume that New York law governs Kolmar's claim for common law indemnity.  See Wormser Mem. at 20-22 (citing cases applying New York law); Kolmar Opp. at 25-28 (same).  "[S]uch implied consent is sufficient to establish choice of law."  Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (citation, internal quotation marks, and punctuation omitted).

The New York Court of Appeals describes the doctrine of common law (or implied) indemnification as follows:

> A party's right to indemnification may arise from a contract or may be implied "based upon the law's notion of what is fair and proper as between the parties" (Mas v Two Bridges Assoc., 75 NY2d 680, 690 [1990]). ""Implied[, or common-law,] indemnity is a restitution concept which permits shifting the loss because to fail to do so would result in the unjust enrichment of one party at the expense of the other" (id., citing McDermott v City of New York, 50 NY2d 211, 216-217 [1980]; see also Rosado v Proctor & Schwartz, 66 NY2d 21, 24 [1985] [indemnity may be implied "to prevent a result which is regarded as unjust or unsatisfactory" and "is frequently employed in favor of one who is vicariously liable for the tort of another" (internal quotation marks and citations omitted)]). Common-law indemnification is generally available "in favor of one who is held responsible solely by operation of law because of his relation to the actual wrongdoer" (Mas, 75 NY2d at 690; see D'Ambrosio v City of New York, 55 NY2d 454, 460 [1982]).
>
> Consistent with the equitable underpinnings of common-law indemnification, our case law imposes indemnification obligations upon those actively at fault in bringing about the injury, and thus reflects an inherent fairness as to which party should be held liable for indemnity.

McCarthy v. Turner Const., Inc., 17 N.Y.3d 369, 374-75 (2011).  Thus, "the common law right to indemnification arises when one party is compelled to pay for the wrong of another."  Perkins Eastman Architects, P.C. v. Thor Eng'rs, P.A., 769 F. Supp. 2d 322, 329 (S.D.N.Y. 2011) (citation and internal quotation marks omitted).  But such indemnity "is barred altogether where the party seeking indemnification was itself at fault."  Monaghan v. SZS 33 Assocs., L.P., 73 F.3d 1276, 1284 (2d Cir. 1996) (collecting cases).  "In other words . . . indemnification involves vicarious

36

liability," <u>Durabla Mfg. Co. v. Goodyear Tire & Rubber Co.</u>, 992 F. Supp. 657, 660 (S.D.N.Y. 1998) (citing <u>D'Ambrosio v. City of New York</u>, 55 N.Y.2d 454, 461-62 (1982)), or liability otherwise "occasioned solely 'by imputation of law,'" <u>Amusement Indus., Inc. v. Stern</u>, 693 F. Supp. 2d 319, 325 (S.D.N.Y. 2010) (quoting <u>Mas v. Two Bridges Assoc.</u>, 75 N.Y.2d 680, 690 (1990)).

Count IV of Kolmar's complaint alleges that Kolmar "was forced to settle the L'Oréal action" as "a direct and proximate result of Wormser's negligent conduct" and "despite having engaged in no wrongdoing of its own." Kolmar Compl. ¶ 143. It adds, "The sole source of L'Oréal's allegations . . . were [sic] Wormser's negligent mismanagement of the CIAF project." <u>Id.</u> at ¶ 142.

Wormser argues that Count IV "fails to plausibly plead the elements of a common law indemnity claim." Wormser Mem. at 21. We reject Wormser's argument to the extent that it is premised on the falsity of Kolmar's allegation that Wormser was solely at fault. <u>See</u> Wormser Mem. at 21; Reply at 6. Obviously, this Court is obligated to accept the allegations of Kolmar's complaint on Wormser's motion to dismiss. <u>See</u> <u>Manhattan Cmty. Access Corp.</u>, 587 U.S. at 806 ("Because this case comes to us on a motion to dismiss, we accept the allegations in the complaint as true.").

Wormser also argues that what matters for purposes of determining Kolmar's indemnity claim is not what may have actually occurred between the parties but how the underlying claim for which Kolmar seeks indemnification was presented. <u>See</u> Wormser Reply at 6. Case law supports this argument. <u>See</u> <u>Chatham Towers, Inc. v. Castle Restoration & Constr., Inc.</u>, 151 A.D.3d 419, 420 (1st Dep't 2017) (looking to how the underlying claim "sought" recovery); <u>Trustees of Columbia Univ. v. Mitchell/Giurgola Assoc.</u>, 109 A.D.2d 449, 453 (1st Dep't 1985)

(looking to what the parties seeking indemnification were "being charged with"); Bd. of Managers of the 650 Sixth Ave. Condo. v. K-W 650 Assocs. LLC, 2018 WL 6309082, at *3-4 (Sup. Ct. Nov. 30, 2018) (looking to the "direct claims" asserted against the party seeking indemnification).

In adjudicating a motion to dismiss, we may take judicial notice of a case before another court "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991). The Second Amended Complaint filed by L'Oréal in L'Oréal USA, Inc. v. Wormser Corp. et al., Index No. 652572/2020 (Sup. Ct. filed June 18, 2020), appears in the record. See Complaint, annexed as Ex. 1 to Declaration of Russell Bogart in Support of Wormser Corp.'s Motion to Dismiss, filed Apr. 30, 2025 (Docket # 32-1) ("L'Oréal Compl.").

The L'Oréal complaint plainly ascribed fault to Kolmar and does not seek to hold Kolmar liable simply because of Wormser's misconduct. L'Oréal alleged that Kolmar and Wormser made separate representations about CIAF's quality, see L'Oréal Compl. ¶¶ 115-16, 128-29, 140-41, and that Kolmar alone "negligently made incorrect statements about the development, manufacturing, and testing" of CIAF, id. ¶ 164, along with "knowing misrepresentations" about the product, id. ¶ 173. Thus, as was true in Chatham Towers, Inc., L'Oréal "sought recovery from [Kolmar] because of the latter's alleged wrongdoing . . . and not vicariously because of any negligence on the part of [Wormser]." Chatham Towers, Inc., 151 A.D.3d at 420.

Accordingly, the motion to dismiss Count IV is granted.

C. Count V-VII (Claims Related to the Powder Foundation Agreement)

1. Breach of Contract

We first address whether Count V (for breach of the Powder Foundation Agreement) is

time-barred.  The complaint alleges that Kolmar and Wormser "reached an agreement" regarding the sharing of losses from "the Client's change of policy" regarding the Powder Foundation "[b]y early 2019."  Kolmar Compl. ¶ 86; see also id. ¶ 147 (alleging that the Powder Foundation Agreement was reached "[a]s of early 2019").  Wormser argues that Kolmar's lawsuit, filed in 2024, is barred by Pennsylvania's four-year statute of limitations.  Wormser Mem. at 8.  Once again, the parties have implicitly agreed that Pennsylvania law applies to the claims regarding the Powder Foundation by citing to Pennsylvania law.  See Wormser Mem. at 6-11; Kolmar Opp. at 13-15.

Kolmar argues that Wormser reset Pennsylvania's four-year statute of limitations in 2022, see Kolmar Opp. at 13-15, based the following allegations:

> 87. . . . [I]n September 2022, Wormser acknowledged in an email that the parties had "agreed 4 years ago," to share the costs from the obsolete Powder Foundation bulk, but had not calculated the amount of loss based on the obsolete Powder Foundation bulk.
> 88. In subsequent email conversations between September 2022 and November 2022, Wormser repeatedly acknowledged that it would share costs from the obsolete Powder Foundation bulk. This included representation that Wormser would "discuss a payment plan."
> 89. In or around September 2022, Wormser and HK Kolmar attended a meeting, in which Wormser reiterated its commitment to share the costs of the obsolete Powder Foundation bulk. Based on Wormser's representations at this meeting, HK Kolmar understood and relied on Wormser's commitment to sharing in the losses arising from the obsolete Powder Foundation bulk.

Kolmar Compl. ¶¶ 87-89.  Kolmar cites to case law holding that under Pennsylvania's "acknowledgement doctrine," "a statute of limitations may be tolled or its bar removed by a promise to pay a debt."  Kolmar Opp. at 14 (quoting Crispo v. Crispo, 909 A.2d 308, 313 (Pa. Super. Ct. 2006)).

Pennsylvania's intermediate appellate court has described the "acknowledgement doctrine" as follows:

39

> A clear, distinct and unequivocal acknowledgement of a debt as an existing obligation, such as is consistent with a promise to pay, is sufficient to toll the statute. There must, however, be no uncertainty either in the acknowledgement or in the identification of the debt; and the acknowledgement must be plainly referable to the very debt upon which the action is based; and also must be consistent with a promise to pay on demand and not accompanied by other expressions indicating a mere willingness to pay at a future time.

Rubin v. Kanya, 2024 WL 4472947, at *6 (Pa. Super. Ct. 2024) (quoting K.A.R. v. T.G.L., 107 A.3d 770, 781-82 (Pa. Super. 2014)); accord In re Maniatakis' Est., 101 A. 920, 921 (Pa. 1917); Raab v. Lander, 427 F. App'x 182, 187 (3d Cir. 2011). "These requirements will be strictly enforced." Markee v. Reyburn, 101 A. 993, 994 (Pa. 1917) (citations omitted); accord Raab, 427 F. App'x at 187.

We need not address Wormser's argument that Kolmar's allegations as to the identification of the debt were insufficient because they did not fix the amount of the debt. See Wormser Mem. at 10. The allegations are insufficient for a separate reason: they do not show that Wormser said anything consistent with "a promise to pay on demand." Rubin, 2024 WL 4472947, at *6. At best, Wormser pledged to "discuss a payment plan," Kolmar Compl. ¶ 88, which is an expression that indicates "a mere willingness to pay at a future," Rubin, 2024 WL 4472947, at *6 — precisely what case law refuses to consider as an acknowledgement of a debt. See Loeffler Thomas P.C. v. Edelman, 2016 WL 1457895, at *8 (E.D. Pa. Apr. 11, 2016) (statements by defendant that "[plaintiff] will be paid every penny that is due to [it]" and that defendant will "make sure [plaintiff] get[s] paid" are "not sufficient to trigger application of the acknowledgment doctrine and toll the statute of limitations").

Accordingly, Count V is barred by Pennsylvania's four-year statute of limitations. Because we hold that Count V is time-barred, we do not reach whether it otherwise fails to state a claim upon which relief can be granted.

2.  Promissory Estoppel

In Count V, Kolmar argues that its promissory estoppel claim is timely because, as just described, Wormser allegedly promised to pay its Powder Foundation debt in 2022, so the limitations period should run from 2022, not 2019.  Kolmar Opp. at 15-16.  This argument is similar to the argument made in Sunlight Elec. Contracting Co., Inc. v. Turchi, 2011 WL 4086077 (E.D. Pa. Sept. 13, 2011).  As was stated in Sunlight Elec. Contracting Co., Inc., any such argument is a "square peg in the round hole of estoppel doctrine."  Id. at *8.  The purpose of promissory estoppel is to "avoid injustice" where there is no enforceable agreement due to lack of consideration.  Id. (citing Crouse v. Cyclops Indus., 560 Pa. 394, 402 (Pa. 2000)).  Here, what is at stake is the original promise to pay for the Powder Foundation bulk.  That promise is now unenforceable not due to lack of consideration but rather because of the expiration of the statute of limitations.  Thus, Kolmar "seeks not to make an unenforceable promise enforceable, but rather to use an alleged acknowledgment of obligation to extend the statute of limitations applicable to what would have been an enforceable agreement in the absence of the statute."  Id. For this reason, "[p]romissory estoppel is . . . inapplicable here."  Id.

Accordingly, Count VI fails states a claim upon which relief can be granted.

3.  Quantum Meruit

Wormser argues that Count VII, the claim in quantum meruit, is time-barred.  See Wormser Mem. at 8; Wormser Reply at 11-12.  As noted, a claim in quantum meruit does not accrue until "the date on which the relationship between the parties is terminated."  Cole, 701 A.2d at 989.  While Kolmar's complaint asserts that "Kolmar's relationship with Wormser was not terminated until June 2024," Kolmar Compl. ¶ 94, this assertion is conclusory and cannot be read to address when the parties' relationship as to the manufacture of Powder Foundation

concluded. At the latest, it appears that the relationship as to the manufacture of Powder Foundation concluded in September 2018, when the Client announced a "policy change regarding the Power Foundation." Kolmar Compl ¶ 83. The allegations following this date, id. ¶¶ 85-90, relate not the manufacture of Powder Foundation but only to ongoing discussions regarding who should bear responsibility for the losses resulting from the "policy change."

In any event, the claim would fail on the merits. In Count VII, Kolmar seeks to recover payment it expected from Wormser "for its work in support of the Powder Foundation project." Id. ¶ 164. "In order to recover in quantum meruit under New York law, a claimant must establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Mid-Hudson Catskill Rural Migrant Ministry, Inc., 418 F.3d at 175. "New York law does not permit recovery in quantum meruit, however, if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim." Id. This limitation dooms Count VII. Kolmar alleges that it "purchased and prepared" the Powder Foundation bulk at an unspecified time "[p]ursuant to discussions and agreements" between the parties. Kolmar Compl. ¶ 161 (emphasis added). Because Kolmar's complaint "unequivocally recognizes the existence of an express contract," Count VII "cannot survive." Tobias v. Notations, Inc., 2015 WL 4654454, at *5 (S.D.N.Y. July 20, 2015); see also Knudsen v. Quebecor Printing (U.S.A.) Inc., 792 F. Supp. 234, 237 (S.D.N.Y. 1992) ("[C]ourts generally dismiss claims for quantum meruit on the pleadings only when it is clear from the face of the complaint that there exists an express contract that clearly controls.").

Wormser asserts that it is permitted to plead a claim for quantum meruit in the alternative because Wormser is arguing that "the parties had no contract governing the Powder Foundation

42

bulk." Kolmar Opp. at 32.  Kolmar provides no citation for this proposition.  In fact, the Court has not found anything in Wormser's brief that addresses the original contract relating to the production of the Powder Foundation.  It is this contract — not the Powder Foundation Agreement — that is at issue for purposes of the quantum meruit analysis because it is this contract that prompted the actions for which Kolmar now seeks recovery in quantum meruit.

For these reasons, Count VII fails to state a claim.

### D. Count VIII (Storage Agreement)

Count VIII alleges breach of contract claim arising out of Wormser's alleged refusal to reimburse Kolmar under the parties' Storage Agreement.  See Kolmar Compl. ¶¶ 167-75. Wormser seeks to dismiss this count only on the ground that the Court would lack subject matter jurisdiction over this claim if all of Kolmar's other claims are dismissed.  See Wormser Mem. at 25 (noting that "Kolmar's Eight Claim for relief seeks $23,892," below the amount in controversy threshold set by 28 U.S.C. § 1332).  Because we have not dismissed all of Kolmar's other claims, Count VIII will not be dismissed.

V.  <u>CONCLUSION</u>

For the foregoing reasons, Kolmar's motion to dismiss (Docket # 27) is granted as to

Count II of the Wormser's complaint.  The motion is denied as to Count I.

Wormser's motion to dismiss (Docket #51) is granted as to Counts II, III, IV, V, VI, and

VII of Kolmar's complaint.  The motion is denied as to Counts I and VIII.

Dated: December 17, 2025
       New York, New York


_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge