UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
HK KOLMAR USA, LLC, :

Plaintiff, : OPINION AND ORDER

-v.- : 24 Civ. 9144 (GWG)

WORMSER CORPORATION, :

Defendant. :

---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Before the Court are the parties' motions to amend their pleadings.[1]

I. PROCEDURAL HISTORY

This case began on November 17, 2024, when HK Kolmar USA LLC ("Kolmar") filed suit against Wormser Corp. ("Wormser"). See Complaint, filed Nov. 27, 2024 (Docket # 1) ("Kolmar Compl."). Later, Wormser filed suit against Kolmar. See Complaint, filed Jan. 14,

---

[1] See Notice of Kolmar's Motion to Amend, filed May 8, 2026 (Docket # 98) ("Kolmar Mot."); Kolmar's Memorandum of Law in Support of Motion to Amend, filed May 8, 2026 (Docket # 99) ("Kolmar Mem."); Declaration of Jennifer M. Rosa, filed May 8, 2026 (Docket # 100) ("Rosa Decl."); Wormser's Memorandum of Law in Opposition to Motion to Amend, filed June 2, 2026 (Docket # 110) ("Wormser Opp."); Kolmar's Reply Memorandum of Law in Support of Motion to Amend, filed June 16, 2026 (Docket # 116) ("Kolmar Reply"); Letter from Russell Bogart, filed June 30, 2026 (Docket # 122); Letter from Jennifer M. Rosa, filed July 2, 2026 (Docket # 123) ("Rosa Letter"); Letter from Russell Bogart, filed July 7, 2026 (Docket # 125) ("Bogart Letter"); Letter from Jennifer M. Rosa, filed July 8, 2026 (Docket # 129); Letter from Russell Bogart, filed July 8, 2026 (Docket # 130).

See Notice of Wormser's Motion to Amend, filed May 8, 2026 (Docket # 101) ("Wormser Mot."); Wormser's Memorandum of Law in Support of Motion to Amend, filed May 8, 2026 (Docket # 102) ("Wormser Mem."); Declaration of Joshua C. Gillette, filed May 8, 2026 (Docket # 103) ("Gillette Decl."); Kolmar's Memorandum of Law in Opposition to Motion to Amend, filed June 2, 2026 (Docket # 112) ("Kolmar Opp."); Wormser's Reply Memorandum of Law in Support of Motion to Amend, filed June 16, 2026 (Docket # 114) ("Wormser Reply").

2025 (Docket # 1 in No. 25 Civ. 377) ("Wormser Compl."). At the parties' request, the Court consolidated the two actions. See Order, dated Mar. 5, 2025 (Docket # 17). Kolmar then filed an amended complaint. See First Amended Complaint, filed May 21, 2025 (Docket # 41) ("Kolmar FAC").

In its complaint, Wormser alleged that the parties executed a Supply Agreement in 2016, pursuant to which Wormser issued Purchase Orders ("POs") to Kolmar for a beauty product called "Confidence in a Foundation" ("CIAF") commissioned by the cosmetics company L'Oréal. See Wormser Compl. ¶¶ 1-3, 54, 61. Unhappy with the quality of CIAF, L'Oréal terminated Wormser's commission, id. ¶ 111, then sued the parties, id. ¶ 122. Wormser brought two claims arising out of these events: one for breach of the POs' terms, relating to Kolmar's alleged failure to procure an insurance policy which would have covered the cost of L'Oréal's suit, see id. ¶¶ 128-36; the other for breach of § 2.2 of the Supply Agreement, which obligated Kolmar to "sell to Wormser . . . the total requirements for Services needed by Wormser," id. ¶ 82; see id. ¶¶ 137-45.

Kolmar brought claims against Wormser for breach of the POs' terms — and in the alternative, for either promissory estoppel or quantum meruit — relating to Wormser's alleged refusal to pay for finished CIAF and component parts. See Kolmar FAC ¶¶ 104-40. It also sought indemnification from Wormser for the cost of settling L'Oréal's suit. See id. ¶¶ 141-45. Separately, Kolmar alleged that Wormser, on behalf of a third party, engaged it to manufacture a powder foundation (another beauty product). Id. ¶ 18. Kolmar brought a quantum meruit claim for Wormser's alleged refusal to pay for invoiced manufacturing services, see id. ¶¶ 160-66, along with a claim for breach of an alleged agreement to share losses incurred during this

engagement, pleading promissory estoppel in the alternative, see id. ¶¶ 146-59. Lastly, Kolmar claimed that Wormser breached a separate contract to store "pallets of goods." Id. ¶ 168.

Both parties filed Rule 12(b)(6) motions, and on December 17, 2025, the Court granted their respective motions in part. See HK Kolmar USA, LLC v. Wormser Corp., 813 F. Supp. 3d 430 (S.D.N.Y. 2025). Relevant to the instant motions, the Court held that Wormser failed to state a claim for breach of § 2.2 of the Supply Agreement, reasoning that Wormser was trying to shoehorn a claim "regarding the quality of CIAF produced by Kolmar" into a contractual provision that "concern[ed] the quantity of CIAF." See id. at 449. Meanwhile, the Court held that Kolmar's claim for breach of the loss-sharing agreement was time-barred, see id. at 458-59, as was its quantum meruit claim related to the parties' powder foundation engagement, a claim also undermined by the allegation that this engagement was governed by "agreements," making resort to quasi-contract principles improper, see id. at 459-60.

The parties have now moved to amend their complaints. As described further below, Wormser's proposed first amended complaint, see Proposed First Amended Complaint, annexed as Ex. A to Gillette Decl. (Docket # 103-1) ("PFAC"), is meant to reconfigure its claim for breach of § 2.2 of the Supply Agreement and bolster its surviving claim, see Wormser Mem. at 1-2. Kolmar's proposed second amended complaint, see Proposed Second Amended Complaint, annexed as Ex. A to Rosa Letter (Docket # 123-1) ("PSAC"), is intended to revive two claims related to the parties' powder foundation engagement: one for breach of contract, the other for quantum meruit, see Kolmar Mem. at 1-2.[2]

[2] The PSAC is, properly speaking, Kolmar's revised proposed second amended complaint. In a letter dated July 2, 2026, Kolmar filed the PSAC in revised form to correct a "factual error." Rosa Letter at 3. Wormser objected to this filing, asserting it was "untimely" under the Court's scheduling order and out of compliance with the Court's individual practices. Bogart Letter at 2. Kolmar's (minor) revision to the PSAC in no way affects its motion to amend, so in the interest

II. LEGAL STANDARDS

Fed. R. Civ. P. 15(a)(2) provides that leave to amend a pleading should be "freely give[n] . . . when justice so requires." A court must have "good reason" to deny leave to amend. See Acito v. IMCERA Grp., Inc., 47 F.3d 47, 55 (2d Cir. 1995). It may deny leave in situations of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . [or] futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962).

As explained below, the only issue we ultimately need consider in deciding the parties' motions to amend is whether the proposed changes to the parties' pleadings would be futile. "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Lucente v. IBM Corp., 310 F.3d 243, 258 (2d Cir. 2002) (citation omitted).

Where a court considers whether a complaint states a claim for relief under Rule 12(b)(6), it must accept the factual allegations contained in the complaint as true, although this principle does not apply to legal conclusions. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (alteration and internal quotation marks omitted). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 556 U.S. at 678 (citation

---

of "secur[ing] the just, speedy, and inexpensive determination" of this action, we will overlook any noncompliance with the Court's orders or individual practices. Fed. R. Civ. P. 1.

omitted), and a court's first task is to disregard any conclusory statements in a complaint, see id. at 679.

Next, a court must determine if the complaint contains "sufficient factual matter" which, when accepted as true, states a claim that is "plausible on its face." Id. at 678 (citation and internal quotation marks omitted); see Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("[A] complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion.") (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient because it has merely "alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## III. DISCUSSION

### A. Wormser's Motion to Amend

Wormser's PFAC seeks to reconfigure a claim for breach of § 2.2 of the Supply Agreement (which the Court previously dismissed) and bolster Wormser's surviving claim for breach of the POs' terms. See Wormser Mem. at 1-2. Kolmar argues that these changes would be futile.

1. Reconfigured Claim

We start with Wormser's previously dismissed claim, which the PFAC reconfigures as a claim for breach of a broader agreement —the "PTP Contract" — "to formulate, develop, manufacture, test[,] and package CIAF for sale to L'Oréal." PFAC ¶ 14. The PTP Contract is alleged to have consisted of the Supply Agreement, the POs for CIAF, and "various communications" between the parties, "with any unstated terms supplied by New York's Uniform Commercial Code ('UCC') and the previous course of dealing between Wormser and [Kolmar]." Id. ¶ 15.

The PTP Contract incorporated the terms of the Supply Agreement, including these:

> 8.1. Each party warrants that the Products sold by such party hereunder shall be (a) of merchantable quality and (b) in accordance with any specifications which may be provided by the other party in the Purchase Order for such Products . . . .
>
> 8.2. In the event that a party determines that there is . . . any damage or defects to the Products[,] or the Products delivered otherwise fails to comply with the requirements under sub-section 8.1 (the "Visible Defects"), the receiving party shall provide written notice to the selling party (a "Claim") of such Visible Defects, together with supporting evidence of the reasons for the rejection, including, if requested by the selling party, samples of the rejected Products. Subject to sub-section 8.3, a party's failure to give the other party notice of any Claim in respect to the Products delivered shall constitute acceptance thereof and a waiver by such party of all claims in respect thereof. Notice of a Claim shall be made in writing within twenty (20) calendar days of the receipt of the Products.
>
> 8.3. If any Products accepted by the purchasing party under sub-section 8.2 do not conform to the warranties set forth in sub-section 8.1 with respect to any defects which could not have been reasonably detected from the purchasing party's inspection or testing activities (a "Latent Defect"), then the purchasing party shall promptly, but in any event within ten (10) Business Days of discovery of such Latent Defect, provide a Claim to the selling party, together with supporting evidence of the reasons for the rejection, including, if requested by the selling party, samples of the rejected Products.

Supply Agreement, annexed as Ex. 1 to Declaration of David Wormser, filed Apr. 30, 2025 (Docket # 33-1) and filed in unredacted form (Docket # 34), at 6.[3] Further, § 2.2 obligated Kolmar to "sell to Wormser . . . the total requirements for Services needed by Wormser." Id. ¶ 2.2.

The PTP Contract also includes terms contained in the POs. Paragraph 3 of these terms provides:

> Buyer reserves the right to cancel this order without liability a) if Seller fails to meet contract commitments related to time, price, quality & quantity; b) if Seller is unable to produce goods in [a] previously approved factory; c) within one week of original order placement. Buyer reserves the right to cancel or delay an order with liability at any time, in which case . . . Seller would be asked to provide supporting documentation of such liability & credit that liability upon future consumption.

Standard Terms and Conditions ("TACs"), annexed as Ex. A to PFAC, at *43 ¶ 3. Paragraph 5 provides:

> Seller warranties that the goods &/or services to be delivered under the order will conform to the description thereof in this order & to the samples & specifications on which this order was placed; that the goods &/or services are of the best materials & workmanship, merchantable, fit for the purpose for which purchased & free from defect . . . . Seller's warranty shall run to . . . Buyer, its successors, assigns & customers, & users of goods sold by Buyer. Seller agrees to replace or correct defects of any goods &/or services not conforming to the foregoing warranty promptly, without expense to . . . Buyer.

Id. ¶ 5.

In the PFAC, Wormser alleges that the parties entered into the PTP Contract in May 2018. PFAC ¶ 17. "Wormser issued more than 150 [POs] to [Kolmar] for the manufacture of CIAF"

[3] While the Supply Agreement is not attached to the PFAC, it is incorporated by reference. E.g., PFAC ¶ 15. We thus consider it. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) ("For purposes of [Rule 12(b),] the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (citation and internal quotation marks omitted).

pursuant to this agreement. Id. ¶ 233. Wormser "performed" under this agreement "by paying $4,896,901.87 to [Kolmar]." Id. ¶ 236.

On April 8, 2019, L'Oréal notified the parties "of 'grit,' 'sand,' and undispersed pigment in CIAF, as well as complaints about separation and a slimy texture. L'Oreal told [Kolmar] and Wormser 'PLEASE DO NOT SHIP' and put all CIAF on hold." Id. ¶ 237. "That same day," Wormser "canceled 512,492 units worth of Open Orders to [Kolmar] for the manufacture of CIAF." Id. ¶¶ 238, 244.

On April 15, 2019, Kolmar "flunked L'Oréal's examination of its plant and manufacturing processes." Id. ¶ 141. Thus, Kolmar allegedly "breached the PTP Contract because [it] was unable to fulfill the Open Orders due to L'Oréal's determination that [it] lacked the equipment, skill[,] and experience" to produce CIAF. Id. ¶ 247. Specifically, L'Oréal determined Kolmar "was unable, going forward" to manufacture a beauty product "of the best materials & workmanship, merchantable, fit for the purpose for which purchased & free from defect," as it undertook to do when it accepted paragraph 5 of the POs' terms. Id. ¶ 249.

The PFAC also alleges that Kolmar "breached the PTP Contract by not disclosing to Wormser the risks that [it] lacked the ability" to produce CIAF. Id. ¶ 248.

The PFAC further alleges that "Wormser canceled the Open Orders without liability because: i) [Kolmar] lacked the ability to meet contract commitments relating to quality[,] and ii) [it] was unable to manufacture the goods in a factory approved by L'Oréal," apparently referencing paragraph 3 of the POs' terms. Id. ¶ 250.

Wormser originally alleged that Kolmar breached § 2.2 of the Supply Agreement (obligating Kolmar to "sell to Wormser . . . the total requirements for Services needed by Wormser") because Kolmar was "unable to fill Wormser's orders for CIAF." HK Kolmar, 813 F.

Supp. 3d at 449 (citation omitted). This claim failed because Wormser's original complaint "at no point allege[d] that it indicated to Kolmar, through a purchase order or otherwise, that it had particular 'requirements for Services' from Kolmar and that Kolmar failed to 'sell' these requirements — the only obligation Kolmar undertook in § 2.2." Id. "Instead," Wormser's original complaint "allege[d] that once L'Oréal terminated the CIAF contract, Wormser had no orders for CIAF to fulfill." Id.

The PFAC now cures this deficiency. The elements of a breach of contract claim, set forth in HK Kolmar, 813 F. Supp.3d at 441, are met because the PFAC alleges: (1) the existence of a contractual obligation in § 2.2 of the Supply Agreement, as incorporated in the PTP Contract, see PFAC ¶ 232; (2) Wormser's performance under the PTP Contract, see id. ¶ 236; (3) that Kolmar breached § 2.2 when it was (allegedly) established that Kolmar was unable to meet Wormser's requirements for "512,492 units worth of Open Orders" for CIAF, id. ¶ 244, due to Kolmar's inability to supply conforming goods, see id. ¶ 247 --- thereby causing Wormser to cancel the specific open orders, id ¶¶ 238, 244; and (4) damages, see id. ¶¶ 245-46, 251-53.[4]

Kolmar advances four arguments why Wormser's breach of contract claim is futile.

First, Kolmar argues that the PFAC does not state a claim concerning the quality of CIAF because it does not allege that Wormser complied with the terms of § 8 of the Supply Agreement. See Kolmar Opp. at 9-12. We previously observed that § 8 governs "how Wormser was to obtain relief regarding complaints about quality." HK Kolmar, 813 F. Supp. 3d at 449. Wormser argues that the terms are "facially inapplicable to the cancellation of Open Orders for goods not physically delivered." Reply at 7. We agree. Section 8's text reflects that it contemplates actual

[4] Our reference to Wormser having alleged damages in the PFAC shall not be taken as a ruling by the Court that all categories of damages claimed by Wormser are legally permissible.

delivery of the products covered. For instance, § 8.2 provides that a claim regarding patent defects must be noticed after "receipt of the Products." Supply Agreement § 8.2. Similarly, § 8.3 sets forth a procedure for lodging a claim regarding latent defects, which would not become evident until "accept[ance] by the purchasing party." Id. ¶ 8.3. Accordingly, Wormser could not comply with these terms when it "canceled the Open Orders" — i.e., outstanding, as-yet unfulfilled POs — for CIAF. PFAC ¶ 250. We do not read the PFAC as seeking damages for any goods that were actually delivered to Wormser, insofar as the PFAC refers to "Open Orders," a phrase which we assume means POs for CIAF which was never delivered. See PFAC ¶ 26. We therefore reject the argument that Wormser's lack of compliance with § 8 means that it cannot seek a remedy for violation of § 2.2 on the ground that Kolmar was unable to supply conforming goods. Section 8 simply does not apply to goods not delivered.

Second, Kolmar argues that, if § 8 of the Supply Agreement did not apply, the claim nevertheless fails because the PFAC nowhere alleges that Wormser afforded Kolmar "a formal opportunity to cure and reasonable notice," as required by paragraph 5 of the POs' terms. Kolmar Opp. at 12. But paragraph 5 applies to goods "to be delivered" under a given PO. TACs ¶ 5. On its face, paragraph 5 does not apply where the PO was properly cancelled under paragraph 3. Whether cancellation was proper — or more precisely, whether Wormser could cancel outstanding POs and still seek damages for Kolmar's alleged failure to supply Wormser's requirements as required by § 2.2 — is an issue that does not depend upon the applicability of paragraph 5 of the POs' terms.

Third, Kolmar argues that Wormser was not entitled to cancel POs "without liability" pursuant to paragraph 3 of the POs' terms because the PFAC never alleges that Kolmar's factory was previously approved, and in any event, Wormser acted before Kolmar allegedly flunked

L'Oréal's examination of its plant and manufacturing processes." See Kolmar Opp. at 12-13. While we recognize that the PFAC contains a number of allegations relating to paragraph 3, see PFAC ¶¶ 134-36, 231, 250, we do not view it as stating a breach of contract claim for a "breach" of paragraph 3. Paragraph 3 merely allowed Wormser to cancel POs "without liability" if certain conditions were met. Certainly, paragraph 3 can be used by Wormser to defend against Kolmar's breach of contract claim. But paragraph 3 does not afford an affirmative claim to Wormser for breach of contract. Instead, as Wormser puts it in its brief, the allegations regarding paragraph 3 are intended merely to be the "converse" of Kolmar's claim "that Wormser cancelled the [POs] with liability" under paragraph 3. Wormser Reply at 10. Thus, paragraph 3 is relevant to Wormser's argument that it is "without liability" with respect to its cancellation of outstanding POs. TACs ¶ 3.

Fourth, Kolmar argues that the allegations in the PFAC "that Kolmar itself had concerns about its ability to manufacture CIAF . . . do not show a breach of contract." Kolmar Opp. at 13. It is not necessary or appropriate to reach the import of these allegations. The PFAC otherwise makes out a breach of contract claim. The Court need not now parse the relevance or import of particular allegations.

2. Surviving Claim

Paragraph 8 of the POs' terms provides, "Seller shall maintain all necessary insurance coverages, including public liability and Workman's Compensation insurance. Seller shall indemnify and save harmless and defend Buyer from any & all claims or liabilities arising out of work covered by this paragraph." TACs ¶ 8. Count I of Wormser's original complaint sought to hold Kolmar liable for breaching paragraph 8 because it failed to procure an insurance policy

that would have covered the cost of L'Oréal's suit. See HK Kolmar, 813 F. Supp. 3d at 445. We held that the word "necessary" in paragraph 8 is ambiguous, emphasizing that:

> [w]hile an expert or the parties' course of dealing (or perhaps Wormser's efforts to have other subcontractors comply with paragraph 8) might shed light on the term's meaning, no such evidence is before us. The only possible clues to the meaning of "necessary" in this context are the examples provided in paragraph 8 itself, that is, the phrase "including public liability & Workman's Compensation insurance."

Id. at 446. We reasoned that "because 'public liability & Workman's Compensation insurance' are given as examples of 'necessary insurance coverages,' it follows that 'necessary insurance coverages' must be similar in nature to public liability or Workman's Compensation insurance." Id. at 447. We could not say "on the record before us" that "any insurance which would have covered Kolmar's liability to L'Oréal[]" was so dissimilar to these examples as to be beyond the scope of the word "necessary," so the claim went forward. Id. at 448.

The PFAC adds allegations, see PFAC ¶¶ 205-19, that in Wormser's view are intended to "alleg[e] extrinsic evidence that elucidates the meaning" of the word "necessary," Wormser Reply at 18. Kolmar argues that these allegations are superfluous because the Court "already held that this claim survived the pleading stage" and that amendment would "therefore be futile to state a claim." Kolmar Opp. at 13-14. It cites to a line of cases denying leave to amend where a party merely seeks to plead additional facts relating to a surviving claim. See Wandering Dago Inc. v. New York State Off. of Gen. Servs., 2014 WL 12797920, at *13 (N.D.N.Y. July 28, 2014) (collecting cases).

We doubt that a proposal to embellish an otherwise valid claim is "futile" inasmuch as the denial of such a proposal cannot rest on the principle that the embellished claim would be unable to "withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Lucente, 310 F.3d at 258; see Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 119 (2d Cir. 2012)

("Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6).").

Ultimately, we view the question of whether embellishment should be permitted as addressed to a court's discretion. In cases where leave to amend would otherwise be denied, it certainly makes sense not to unnecessarily burden the parties with having to respond to a new pleading. See Schmidt v. Stone, 2018 WL 4522082, at *12 (E.D.N.Y. Jan. 29, 2018) (amendment to surviving claims would "needlessly would require the defendant to expend time and resources drafting an answer"); Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, 2020 WL 1659849, at *14 (S.D.N.Y. Apr. 3, 2020) (amendment to surviving claims would "needlessly risk an inefficient further round of motion practice at a time when this litigation, at long last, is nearly ripe for summary judgment"). Where a complaint is to be amended anyway, however, we see little prejudice or other harm in permitting the new allegations to be added.

Here, Kolmar does not explain how it would be prejudiced by amendment of Wormser's claim for breach of the PO' terms other than to contend without explanation that amendment would "broaden the scope of discovery." Kolmar Opp. at 15. If Kolmar were right, we might have a reason to deny Wormser's motion, although "the need for new discovery, without more, does not constitute undue prejudice." Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P., 2015 WL 4097927, at *9 (S.D.N.Y. July 6, 2015) (collecting cases). In any event, we do not think the new allegations affect the permitted scope of discovery. We have already determined that the term "necessary" is "ambiguous as used in paragraph 8." HK Kolmar, 813 F. Supp. 3d at 446. As a result, any extrinsic evidence elucidating what the parties meant by the term "necessary" is fair game in discovery, although such evidence "ultimately has to be tied to the [POs] and the word 'necessary' in the [POs]." Transcript of May 29, 2026 Conf., filed June 2, 2026 (Docket # 107)

at 17:13-15; see id. at 2:24-3:24, 6:7-20, 9:14-10:2. Thus, the scope of discovery will not change with Wormser's amendment.

* * *

In sum, Kolmar's motion to amend is granted.

B. Kolmar's Motion to Amend

Kolmar's PSAC would resuscitate two claims related to the parties' powder foundation engagement that the Court previously dismissed: one for breach of contract, the other for quantum meruit. See Kolmar Mem. at 1-2. Wormser argues that both of these changes are futile, that it would be unduly prejudiced by amendment, and that Kolmar's motion to amend is made in bad faith. See Wormser Opp. at 9-21. Because we find that amendment would be futile as to these claims, it is not necessary to reach the other grounds raised by Wormser.

1. Powder Foundation Breach-of-Contract Claim

Kolmar's PSAC alleges that a "Continuing Contract" to produce powder foundation for a third party (identified as "the Client") "began in 2005." See PSAC ¶¶ 84-85. This agreement was "evidenced through, among other things," Kolmar's "provision of manufacturing services for Powder Foundation pursuant to purchase orders issued to HK Kolmar by Wormser, a shared spreadsheet between the parties, the parties' understandings and course of dealings . . . and the Supply Agreement entered into by the parties in 2016." Id. ¶ 86.

"Pursuant to the Continuing Contract" and "in coordination with Wormser," Kolmar "purchased and prepared bulk for the Powder Foundation project with the expectation that it would be compensated for its services." Id. ¶¶ 87-88. Kolmar produced this bulk in order to fulfill future POs for powder foundation from Wormser and offer better pricing. Id. ¶ 88.

In September 2018, the Client stopped "accept[ing] Powder Foundation that had been serviced or manufactured with bulk that was more than six months old." Id. ¶ 91. As a result, "$1.07 million worth of the bulk Powder Foundation product that [Kolmar] had produced . . . was rendered unusable." Id. "In the following months, [Kolmar] and Wormser discussed how to absorb the losses that arise as a result of the Client's policy change," and as of 2019, Kolmar "understood that Wormser would be responsible for covering two-thirds of the bulk liability amount," id. ¶ 93, although this amount was never paid, see id. ¶ 94. In contrast to Kolmar's first amended complaint, see Kolmar FAC ¶ 147, the PSAC never alleges that there was an agreement that Wormser would pay a two-thirds share; indeed, the PSAC alleges that "Wormser disavows that any agreement was ever reached regarding cost allocation," PSAC ¶ 93.

Despite Wormser's non-payment, "the parties' relationship in connection with the production of Powder Foundation continued until June 2024." Id. ¶ 96. Specifically, "Kolmar provided manufacturing services for the Powder Foundation to Wormser through June 2024." Id. ¶ 95. The PSAC alleges that, as of June 2024, "Wormser owed $1,073,707.54 to [Kolmar] for the total liability it incurred under the Continuing Contract, due to the Client's policy change." Id. ¶ 96; see id. ¶ 94 ("Wormser owes [Kolmar] a total $1,073,707.54 for manufacturing services provided by [Kolmar] pursuant to the Continuing Contract, consisting of $926,439.50 in material costs, $76,425.84 in overhead costs, and $70,842.20 in direct labor costs.").

The Court agrees with Wormser that the allegations in the PSAC fail to state a claim for breach of contract.[5] See Wormser Opp. at 17-19. The only part of the Continuing Contract

[5] However, the Court disagrees that a merger clause in the Supply Agreement has any bearing on Kolmar's breach of contract claim. See Wormser Opp. at 17-18. This merger clause caused the Supply Agreement to "replace[] all previous agreements and understandings, if any, between the parties." Supply Agreement ¶ 15.2. It had no effect on any subsequent agreements or other obligations undertaken by the parties through the Continuing Contract alleged in the PSAC.

whose terms are alleged with specificity and relate to a promise to pay for powder foundation is the Supply Agreement, see PSAC ¶¶ 37-42, which is incorporated into the PSAC by reference, see Chambers, 282 F.3d at 152. The PSAC's references to POs, see, e.g., PSAC ¶ 86, do nothing to explain Wormser's contractual obligation to pay for powder foundation inasmuch as POs are contemplated by the Supply Agreement itself, see Supply Agreement ¶ 4.1, and there are no allegations that the terms of the POs were breached. The references to a "shared spreadsheet" is similarly unhelpful as the PSAC gives no indication of why the spreadsheet created an obligation to pay for powder foundation. Indeed, Wormser's only allegations regarding the spreadsheet are merely that it was a mechanism to submit POs. See PSAC ¶¶ 41, 69, 72, 86. The conclusory references to the parties' "understandings and course of dealings regarding all aspects of the orders and the process to fill the orders," id. ¶¶ 18, 86, similarly do nothing to show the obligation Wormser purportedly undertook with respect to paying for powder foundation.

Simply put, the PSAC contains no non-conclusory allegations that Wormser assumed a contractual obligation to pay Kolmar for powder foundation bulk it manufactured independent of Wormer's obligation under the Supply Agreement to pay for finished powder foundation. The closest the PSAC comes to even addressing this question is to allege that Wormser "produced" bulk "in coordination with Wormser" and that Wormser had an "expectation" of payment. Id. ¶¶ 87-88. But a conclusory allegation that the product was produced "in coordination with Wormser" is light-years away from allegations showing that Wormser undertook to compensate Kolmar for bulk. Further, Kolmar's own expectation is irrelevant in the absence of an agreement by Wormser that it had an obligation matching that expectation.

The PSAC's assertion that "Wormser owed $1,073,707.54 to [Kolmar] under the Continuing Contract," PSAC ¶ 131, is inadequate to "state when and how the defendant breached

[a] specific contractual promise," Radin v. Albert Einstein Coll. of Med., 2005 WL 1214281, at *10 (S.D.N.Y. May 20, 2005); accord Hedgeye Risk Mgmt., LLC v. Dale, 2023 WL 6386845, at *14 (S.D.N.Y. Sept. 29, 2023). "A broad, unsupported, and conclusory statement that a defendant owes more money . . . under a contract," such as the one we confront in the PSAC, "is precisely the type of 'naked assertion' of a claim that does not suffice" under Rule 8(a)(2). United States v. Liberty Mut. Ins. Co., 2016 WL 6464481, at *1 (S.D.N.Y. Nov. 1, 2016) (quoting Twombly, 550 U.S. at 557).

It is of no moment that the PSAC alleges that the parties at some unstated point in time "discussed how to absorb" Kolmar's losses or that Kolmar allegedly "understood that Wormser would be responsible for covering two-thirds of the bulk liability amount." Id. ¶ 92-93. This is because Kolmar does not allege any agreement on this point and even admits that "Wormser disavows that any agreement was ever reached regarding cost allocation." Id. ¶ 93. No breach of contract claim can be brought relating to the discussions over Wormser's two-thirds responsibility because "[i]f there is no meeting of the minds on all essential terms, there is no contract" to sue on. Schurr v. Austin Galleries of Illinois, Inc., 719 F.2d 571, 576 (2d Cir. 1983).

In sum, the PSAC fails to show what are "the relevant breached provisions of" the purported contract. Negrete v. Citibank, N.A., 187 F. Supp. 3d 454, 468 (S.D.N.Y. 2016), aff'd, 759 F. App'x 42 (2d Cir. 2019).

2. Powder Foundation Quantum Meruit Claim

Kolmar's PSAC also pleads a claim in quantum meruit related to the powder foundation engagement. See PSAC ¶ 135 ("To the extent that the Continuing Contract is not deemed an enforceable, continuing contract, Wormser contests [its] existence . . . and the parties otherwise had no Powder Foundation-based contract, [Kolmar] pleads quantum meruit in the alternative.").

In support of this claim, Kolmar asserts that it "had a reasonable expectation of receiving payment from Wormser for its work in support of the Powder Foundation project, consistent with the parties' course of dealing, which included Wormser's issuance of [POs] to [Kolmar] and the parties' understandings regarding [Kolmar's] production of extra bulk to satisfy the [POs]." Id. ¶ 139. It also asserts that Wormser "accepted" its services and connects this acceptance to the fact that "Wormser issued [POs] . . . which led [Kolmar] to purchase and prepare bulk for the Powder Foundation project." Id. ¶ 137. The PSAC adds that "Wormser was aware this bulk included extra bulk beyond the amounts stated in the [POs]" and that "[Kolmar] performed these services in reliance on Wormser's instructions and purchase orders, with a reasonable expectation that Wormser would pay [Kolmar] for the bulk." Id. ¶¶ 137-38.

Kolmar seeks recovery of "the fair value of the benefit conferred upon Wormser," which it pegs at a familiar figure: $1,073,707.54. Id. ¶ 140. Thus, Kolmar is seeking to recover its losses related to the bulk which was rendered unusable in September 2018.

A plaintiff seeking relief in quantum meruit must establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (citation and internal quotation marks omitted). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000) (quoting City of Syracuse v. R.A.C. Holding, 258 A.D.2d 905, 905 (4th Dep't 1999)).

In opposition to this claim, Wormser relies on the principle of New York law that "the existence of valid and enforceable written contracts precludes recovery under the causes of

action sounding in promissory estoppel and unjust enrichment, which arise out of the same subject matter."[6] Grossman v. New York Life Ins. Co., 90 A.D.3d 990, 991-92 (2d Dep't 2011); see Clark–Fitzpatrick, Inc. v. Long Is. R.R. Co., 70 N.Y.2d 382, 388 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.") (citations omitted); accord HK Kolmar, 813 F. Supp. 3d at 455.

The existence, validity, and enforceability of the Supply Agreement are not disputed. Indeed, Kolmar repeatedly cites to the Supply Agreement in the PSAC. As we previously noted,

> the provisions of the Supply Agreement are wide-ranging, and thus appear to govern all aspects of the parties' relationship regarding the production of products — with the exception of the particular product . . . and quantity thereof to be produced. The Supply Agreement specifically provides that Wormser would direct Kolmar to produce a particular product in some quantity through a "purchase order." See Supply Agreement ¶ 4.1 ("Each order for Products purchased pursuant to this Agreement shall be in writing and shall be sent to the address of the party selling the Products . . . (the 'Purchase Order')."). The Supply Agreement contains a number of provisions as to how Kolmar was expected to deliver products ordered through purchase orders, how title to those products would pass under purchase orders, and when payment was due under purchase orders. Id. ¶¶ 4.2-4.4, 6.1.

Id. at 441-42. The Supply Agreement necessarily contemplated that Kolmar would need to produce bulk whenever Wormser asked for powder foundation by means of a PO.

Certainly, there is no provision in the Supply Agreement that addresses how any excess bulk would be treated if Wormser ordered less powder foundation than Kolmar expected. But the absence of an on-point provision is not what determines whether a quantum meruit claim can proceed in the face of a contract. Rather, a quantum meruit claim can proceed only if the plaintiff is not seeking to recover for claims "for events arising out of the same subject matter" as

[6] While Grossman refers to "unjust enrichment," quantum meruit "is merely the means by which the former is remedied." Strauss v. Hearst Corp., 1988 WL 18932, at *9 (S.D.N.Y. Feb. 19, 1988) (citation omitted).

the contract. Clark–Fitzpatrick, Inc., 70 N.Y.2d at 388 (emphasis added). Here, the preparation of excess bulk fits arises out of the same subject matter as the Supply Agreement inasmuch as the Supply Agreement impelled Wormser to produce powder foundation — and thus the bulk that turned out not to be acceptable — in the first place. In other words, the Supply Agreement itself contemplated the need for Kolmar to make bulk in order to fulfill its obligations under the Supply Agreement. Because the Supply Agreement makes no provision for payment to Kolmar where bulk is not needed or is not acceptable, New York law does not permit the parties' rights and remedies as stated in the contract to be avoided by interposing a claim in quantum meruit. See Hudson & Broad, Inc. v. J.C. Penney Corp., 2013 WL 3203742, at *6 (S.D.N.Y. June 18, 2013) (holding that a plaintiff "cannot recover the value of preparatory manufacturing work on a quantum meruit theory"), aff'd, 553 F. App'x 37 (2d Cir. 2014); Rogers v. HSN Direct Joint Venture, 1999 WL 595533, at *2 (S.D.N.Y. Aug. 5, 1999) (observing that "money expended in preparation for eventually performing under an agreement is not compensable in quasi-contract").

Kolmar's brief relies on the principle that it should be allowed to proceed in the alternative on the quantum meruit claim on the ground that Wormser disputes the existence, validity, and scope of the Continuing Contract as a whole, if not the Supply Agreement. See Kolmar Reply at 14-15. But whether Kolmar can pursue a quantum meruit claim in the alternative is not at issue anymore, given that the PSAC's breach of contract is futile for the reasons given above. Instead, the issue is whether its quantum meruit claim can proceed at all in the face of a contract governing the same subject matter.

We recognize that, under New York law, "recovery in quasi-contract outside the existing contract may be had" where a party "has rendered additional services upon extra-contractual

representations by the other party." U.S. E. Telecomms., Inc. v. U.S. W. Commc'ns Servs., Inc., 38 F.3d 1289, 1298 (2d Cir. 1994); accord Milherst Constr., Inc. v. Natale Bldg. Corp., 218 A.D.3d 1310, 1312 (4th Dep't 2023). But the PSAC never reveals what Wormser communicated to Kolmar that resulted in the production of "extra bulk"; it alleges only that the bulk came into being "in reliance on Wormser's instructions and [POs]." PSAC ¶¶ 137-38. Of course, any reliance on POs would relegate Wormser only to a contractual remedy, and the complaint is entirely unclear what Wormser's "instructions" were.

Thus, the central problem with the application of this branch of case law to the Supply Agreement is that the allegations of the PSAC are so threadbare that we simply cannot determine if the elements of a quantum meruit claim are met. As to the "expectation of compensation" element, the circumstances of the parties' interaction must imply an "understanding on the part of both parties that there was an obligation to pay." Aluminum Fair v. Abdella, 90 A.D.2d 603, 603 (3d Dep't 1982) (citation omitted). The PSAC never alleges any facts showing that there was an expectation on Wormser's part that it would be required to pay for extra bulk: instead, the PSAC alleges only that Kolmar harbored such an expectation. See PSAC ¶¶ 87, 136, 138-39.

More glaringly, there are no non-conclusory allegations that there was an "acceptance" of the services at issue: that is, the manufacture of extra bulk. The only allegation on point is that Wormser "accepted" Kolmar's services when it "issued [POs] to [Kolmar], which led [Kolmar] to purchase and prepare bulk for the Powder Foundation project" and that Wormser was "aware this bulk included extra bulk beyond the amounts stated in the [POs]." Id. ¶ 137. But these allegations do nothing to show that Worser "accepted" the excess bulk. It is unclear what Wormser's acceptance involved.

In the end, the allegation related to the PSAC's quantum meruit claim reflect that Kolmar's production of excess bulk product was not some extra-contractual arrangement under which Kolmar performed "services" whose "acceptance" by Wormser was unrelated to the existence of the Supply Agreement. Mid-Hudson Catskill Rural Migrant Ministry, Inc., 418 F.3d at 175. Rather, the PSAC reflects only that the excess bulk was produced as a result of the operation of the Supply Agreement.

* * *

In sum, because inclusion of the revised claims in Kolmar's PSAC would be futile, Kolmar's motion to amend is denied.

Conclusion

For the reasons stated above, Wormser's motion to amend (Docket # 101) is granted. Kolmar's motion to amend (Docket # 98) is denied. Within 14 days, Wormser shall file an amended pleading consistent with this Order and the Court's prior rulings.

Dated: August 25, 2026
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge